REVISED - December 22, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-30776
_____


GROOME RESOURCES LTD, LLC,

                              Plaintiff - Appellee

UNITED STATES OF AMERICA,

                              Intervenor

     v.

PARISH OF JEFFERSON,

                              Defendant - Appellant

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
November 20, 2000

Before KING, Chief Judge, and REYNALDO G. GARZA and PARKER,
Circuit Judges.

KING, Chief Judge:

     Defendant-Appellant Parish of Jefferson, Louisiana

("Parish") appeals the district court's grant of a permanent

injunction in favor of Plaintiff-Appellee Groome Resources Ltd.,

L.L.C. ("Groome Resources").  The permanent injunction enjoined

the Parish from interfering with or withholding approval of

Groome Resources' application for "reasonable accommodations" under 42 U.S.C. § 3604(f)(3)(B) to operate a for-profit group home for five individuals suffering from Alzheimer's disease. Specifically, the Parish raises a constitutional challenge to the statutory basis of the district court's injunction.  The Parish argues that Congress exceeded its constitutional authority in passing § 3604(f)(3)(B) of the Fair Housing Amendments Act of 1988 (FHAA),[1] which defines housing discrimination to include a refusal to make reasonable accommodations for handicapped individuals.  We join three circuits in concluding that Congress acted under its Commerce Clause power in enacting the FHAA, and because, under the facts presented, Groome Resources is a for-profit company engaged in and substantially affecting interstate

---

[1]  Section 3604 reads in relevant part:

It shall be unlawful—
. . .
(f) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap-
. . .
(3) For purposes of this subsection, discrimination includes-
. . .
(B)  a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . .

42 U.S.C. § 3604(f)(3)(B).

commerce, we AFFIRM the district court.  See U.S. CONST. art. I, § 8, cl. 3.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Groome Resources is a for-profit limited liability partnership that operates group homes for individuals afflicted with Alzheimer's disease.  These homes provide full-time supervision, food, shelter, and supportive services for elderly patients who are unable to live independently due to their illness.  Each home cares for five Alzheimer's patients and is staffed by a full-time, rotating caretaker.  Each patient pays $3,400 per month for his or her accommodations and care.  Groome Resources currently operates four group homes in the Greater New Orleans area and seeks to open a fifth in a residential district of the Parish of Jefferson.

To facilitate this expansion, on February 8, 1999, Groome Resources signed a contract to purchase a home at 5109 Elmwood Parkway located in the Parish.  The contract was between Groome Resources and the seller, Cendant Mobility Services Corporation, a national relocation assistance organization.  The agreement to purchase was contingent on Groome Resources obtaining a variance to the local zoning laws, which would permit the operation of a group home for five unrelated individuals operated for profit.

3

Groome Resources had scheduled a closing date for the home for one month from the signing.

The Parish zoning ordinance at issue regulates property use in single-family residential districts. The zoning ordinance provides,

> This district is composed of certain lands and structures having a low density, single family residential character and additional open area where it is desirable and likely that such similar development will occur. Uses are limited to single family residences and such non-residential uses as are intended primarily to provide service to the adjacent neighborhood.

JEFFERSON PARISH, LA., COMPREHENSIVE ZONING ORDINANCE, § VII-A, at 7A-1, no. 1 (1998). The zoning ordinance defines "family" as,

> one or more persons related by blood or marriage living together and occupying a single housekeeping unit with single culinary facilities or a group of not more than four persons living together by mutual agreement and occupying a single housekeeping unit with single culinary facilities on a non-profit cost-sharing basis.

Id. § III, at 3-6, no. 25.

The Parish zoning ordinance also provides a process by which reasonable accommodations can be made for handicapped residents under the Fair Housing Amendments Act:

> Nothing in this ordinance shall be construed to prevent a reasonable accommodation for handicapped persons as defined by the Federal Fair Housing Act in accordance with Federal, State and Parish procedures. Application for reasonable accommodation shall be submitted to the Department of Inspection and Code Enforcement for review and approval.

Id. § XX, at 20-25, no. 14. On February 11, 1999, Groome Resources applied for a "reasonable accommodation" to allow the proposed group home for five non-related individuals to operate

4

in a single-family dwelling on a for-profit basis.  Groome Resources had successfully applied for a similar group home in another residential district in the Parish, a request that had been granted within forty-five days.

Under the procedures set up by the Parish, an application for reasonable accommodations must be reviewed by the Department of Inspection and Code Enforcement and the Parish Attorney's Office. There is no formalized procedure or timetable for an application, although the target timetable is forty-five days. In addition, the councilman in whose district the property sits and the residents of the district are notified about the application.

On March 15, 1999, the Parish Attorney's Office recommended approval of Groome Resources' application for reasonable accommodations for the Elmwood Parkway group home.  On March 16, 1999, the director of the Department of Inspection and Code Enforcement also recommended approval of the application. Several days later, however, members of the Elmwood Park Civic Association, through their councilman, voiced opposition to the application.  On March 19, 1999, residents of the neighborhood, the councilman and the Parish Attorney met to discuss the planned group home.[2]  Due to the opposition of the residents, no official

_____

[2]  A March 20, 1999 letter from Libby Olivier Tittle, 1st Vice President of the Elmwood Park Civic Association, to Councilman Edmond J. Muniz, included in the record, evidences the community sentiment toward the group home.  Entitled "Elmwood

decision was made regarding the Groome Resources reasonable accommodations application.

On April 28, 1999, Groome Resources wrote to the Parish to inquire about its pending application.[3] The letter threatened legal action pursuant to the FHAA if the reasonable accommodations request was not decided upon. Groome Resources explained that, due to the delay, it had accrued monetary damages related to the rescheduling of the closing date on the property. The Parish responded by letter on April 30, 1999, stating that the application remained under review and further information might be requested. On May 4, 1999, the Parish requested additional information on the Groome Resources company and the

Park Civic Association's Opposition to Group Home at 5109 Elmwood Parkway," the letter summarizes the meeting between the neighbors and the councilman. In relevant part it states:

> The permit has not yet been granted and will be delayed to allow both Tom Wilkinson, Parish Attorney, and our Civic Association to prepare to challenge the opening and operating of this group home.
> . . .
> (2) You [Councilman Muniz] oppose the granting of the permit. Tom Wilkinson will recommend that the Parish Council not approve the permit because it could be a good test case to challenge these group homes in R-1 classified zones.

Letter from Libby Olivier Tittle, 1st Vice President of the Elmwood Park Civic Association to Councilman Edmond J. Muniz (March 20, 1999).

[3] The United States Justice Department, Civil Rights Division also wrote to the Parish on May 6, 1999, inquiring about the status of Groome Resources' application. The Parish Attorney, Thomas Wilkinson, informed the Justice Department that the application was under review.

6

proposal for the Elmwood Parkway group home.  On May 12, 1999,
Groome Resources submitted the requested information to the
Parish.  On May 14, 1999, Groome Resources filed suit in federal
district court seeking injunctive relief "enjoining and
restraining the [Parish] from withholding approval of [the]
Application for Reasonable Accommodation."

Groome Resources argued that the Parish's continued delay
frustrated the purpose of the FHAA and was tantamount to a denial
of its reasonable accommodations application.  As such, Groome
Resources argued it was discriminated against under the FHAA and
sought an injunction to remedy that discrimination.  In response,
the Parish argued that the suit was premature as no final
decision had been made on the application, that Groome Resources
could not meet the procedural or substantive requirements for an
injunction, and that the enactment of the reasonable
accommodations provision exceeded the constitutional authority of
Congress.

The district court held an evidentiary hearing on Groome
Resources' motion for a preliminary injunction and consolidated
it with a trial on the merits.  The district court held that the
FHAA was "a valid exercise of Congress' power under the Commerce
Clause."  Further, it found that despite the fact that the Parish
had never formally denied Groome Resources' application, the case
was ripe for decision.  Deposition testimony revealed that there
was no planned action on the application, and the district court

7

found that the attorney in charge of the review process "could not say what the current status of the application was, what if anything remained to be done to complete the process or when it might be done, and could not say who the ultimate decision maker would be." The district court concluded that "the Parish delayed acting on the application in the hope that the matter will become moot if the proposed purchase falls through." Therefore, "to deny plaintiff's claim as premature would effectively frustrate the clear mandates of the Fair Housing Act."

In determining the merits of the reasonable accommodations application, the district court found that the addition of one person to the four person limit was reasonable and necessary to allow individuals with Alzheimer's disease an equal opportunity to live in a residential setting, and that "[t]he trial evidence convinces the Court that the artificial limit of four unrelated persons living in a single group home will make it economically unfeasible for [Groome Resources] to operate the proposed home." The district court concluded,

> The other homes operated by Groome have been well received by their residential neighbors. Since none of the residents drive, there are few if any automobiles at the homes. There is absolutely no evidence that this proposed group home with five Alzheimer's patients would cause any problems or in any way impact the health, safety, welfare or character of the neighborhood. If the home was occupied by a family, there would be no limit on the number of persons who reside there, or the number of automobiles or visitors at the home. In fact, the same residential zoning permits small home businesses, schools, and day care centers, all of which cause more congestion and traffic problems than is expected from the group home. The requested accommodation is clearly

8

> reasonable and necessary to allow the handicapped to have equal opportunity to live in residential settings of their choice, as mandated by the Fair Housing Act Amendments of 1988.

Accordingly, the district court permanently enjoined the Parish from interfering with or withholding approval of a reasonable accommodations application for Groome Resources.

On appeal, the Parish challenges the constitutional basis of the district court's holding — namely the constitutional authority of Congress to pass 42 U.S.C. § 3604(f)(3)(B). First, the Parish argues that Congress exceeded its authority under the Commerce Clause in enacting the "reasonable accommodations" clause. Second, the Parish argues in the alternative that § 3604(f)(3)(B)'s reasonable accommodations standard, as applied to facially neutral zoning ordinances, is void for vagueness.[4] After careful interpretation of the legislative history of the

---

[4] We accept that the Parish has properly appealed the constitutionality of § 3604(f)(3)(B) and dismiss Groome Resources' procedural challenges to this appeal. First, we disagree with Groome Resources' contention that the district court's injunction rested on a finding of disparate impact and, thus, remains in effect regardless of our decision on the constitutionality of the reasonable accommodations provision of the FHAA. The focus of the injunction was clearly the failure of the Parish to provide reasonable accommodations for the proposed group home and not a finding that there was a discriminatory intent or effect on handicapped individuals in the Parish. Second, we disagree with Groome Resources' argument that the Parish's failure to brief in detail a Fourteenth Amendment challenge to the FHAA is fatal to its overarching constitutional challenge. The district court expressly held that the FHAA "was a valid exercise of Congress' power under the Commerce Clause." It is from that finding that the Parish based its appeal.

FHAA, and an analysis of the Supreme Court's recent Commerce Clause cases, we affirm the holding of the district court.[5]

## II.  STANDARD OF REVIEW

We review the constitutionality of a federal statute de novo.  See United States v. Luna, 165 F.3d 316, 319 (5th Cir. 1999); United States v. Bailey, 115 F.3d 1222, 1225 (5th Cir. 1997).

## III.  RIPENESS

As an initial matter, we affirm the district court's holding that the issue before this court is ripe for review. Jurisdiction is a question of law which we review de novo.  See United States v. Jimenez-Martinez, 179 F.3d 980, 981 (5th Cir. 1999); see also Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1483 (10th Cir. 1995) ("Because ripeness is a jurisdictional issue, our standard of review is de novo.").

While not briefed or argued by the Parish, federal courts have a duty to consider objections to our jurisdiction sua sponte.  See United Transp. Union v. Foster, 205 F.3d 851, 857 (5th Cir. 2000) ("[E]very federal appellate court has a special

_____

[5]  Because we conclude that Congress possesses the authority to enact the FHAA as an activity substantially affecting interstate commerce, we need not reach the alternative argument that Congress possessed authority to enact the Act under § 5 of the Fourteenth Amendment.

10

obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it." (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998)).

"A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical. The key considerations are 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'. . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 833 F.2d 583, 586-87 (5th Cir. 1987) (citations omitted) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), modified on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). We find that the district court was correct in resolving the legal question of whether the Parish had failed to approve Groome Resources' reasonable accommodations application for its group home, and that the hardship to Groome Resources constituted an immediate injury requiring judicial relief.

First, as to the "fitness of the issues for judicial decision," we agree with the Court of Appeals for the Fourth Circuit that "[u]nder the Fair Housing Act . . . a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent

11

proceedings." Bryant Woods Inn, Inc. v. Howard County, Md. 124 F.3d 597, 602 (4th Cir. 1997).[6] This denial can be both actual or constructive, as an indeterminate delay has the same effect as an outright denial. In the instant case, the district court was well within its discretion to decide that a reasonable accommodation was denied by the unjustified delay of the Parish officials.

From the facts at trial, a full and complete application had been submitted and been reviewed.[7] The district court recognized that ninety-five days had elapsed between the time the application was submitted and the filing of the lawsuit, and despite the target date of forty-five days, the application had been pending for 127 days without action at the time of the court's decision. During this time, Groome Resources was

---

[6] As such, ripeness in the Fair Housing Act context must be distinguished from ripeness cases involving unconstitutional takings or other zoning issues. See Bryant, 124 F.3d at 602 ("Fair Housing Act claims are thus unlike takings claims, which do not ripen until post-decisional procedures are invoked without achieving a just compensation.").

[7] Persuasive to the district court was the fact that the only two governmental departments that needed to approve the reasonable accommodations application had unofficially approved the application in March. The effect of the intervention of the district councilman and the Parish residents was evident as approval by the councilman or the residents was not required in the process. The continued delay based on neighborhood opposition, see Letter of Libby Olivier Tittle, supra note 2, therefore, demonstrated an attempt to frustrate Groome Resources' purchase and operation of a group home.

12

required to postpone its closing date several times.[8]  Further, the court found that four months after the filing of the lawsuit, the Parish officials in charge of the application could not provide any timetable or plan for acting on the application. While never formally denying the request, the Parish's unjustified and indeterminate delay had the same effect of undermining the anti-discriminatory purpose of the FHAA.  As no further factual development was required, the district court exercised its discretion to resolve the legal issue presented.

Regarding the second factor of the ripeness inquiry, "[n]umerous courts have stressed that housing discrimination causes a uniquely immediate injury.  Such discrimination, which under the FHA includes a refusal to make reasonable accommodations, makes these controversies ripe."  Assisted Living Assocs. v. Moorestown Township, 996 F. Supp. 409, 427 (D.N.J. 1998) (listing cases).  In addition to the discriminatory injury necessitating judicial relief, Groome Resources faces concrete economic hardship from the continued delay.  The district court found that Groome Resources would be liable for a $2000 penalty for the delay in closing, not to mention the economic loss of being unable to operate the facility.  Further delay in obtaining judicial resolution of this issue will likely cause additional

---

[8]  The district court was even forced to intervene on behalf of Groome Resources to secure one of the postponements in the closing date and found in its opinion that "[the closing] likely will not be extended further."

13

harm to Groome Resources.  Because the financial penalties resulting from the delay in closing and in commencing operations, present concrete hardships for the plaintiffs that frustrate the purpose of the FHAA, we agree with the district court that the issue is ripe for review.

**IV.  CONSTITUTIONALITY OF THE FAIR HOUSING AMENDMENTS ACT**

We today join three other circuits that have upheld the constitutionality of the Fair Housing Amendments Act.  See Oxford House-C v. City of St. Louis, 77 F.3d 249, 251 (8th Cir. 1996) (holding that "Congress had a rational basis for deciding that housing discrimination against the handicapped, like other forms of housing discrimination, has a substantial effect on interstate commerce"); Morgan v. Sec. of Hous. & Urban Dev., 985 F.2d 1451, 1455 (10th Cir. 1993) ("The legislative record, when viewed against a backdrop of the legislative history of the 1968 Fair Housing Act, provides a rational basis for finding that the sale and rental of residential housing . . . concerns more than one state and has a real and substantial relation to the national interest." (citations and internal quotation marks omitted)); Seniors Civil Liberties Ass'n v. Kemp, 965 F.2d 1030, 1034 (11th Cir. 1992) ("We find no merit in plaintiffs' argument that, because the real estate market involves private intrastate

14

transactions, no interstate commerce is involved in residential sales and rentals.").

Our analysis of the constitutionality of the FHAA is guided by the Supreme Court's recent decisions in <u>United States v. Morrison</u>, 120 S. Ct. 1740 (2000), and <u>United States v. Lopez</u>, 514 U.S. 549 (1995).  After a brief examination of the purpose of the FHAA, and the controlling Commerce Clause jurisprudence, we consider the constitutionality of the FHAA and the reasonable accommodations provision now challenged by the Parish.


### A. Purpose of the Fair Housing Amendments Act

In response to a history of national discrimination against individuals with disabilities, Congress enacted the FHAA in 1988.[9]  The purpose of the Act was to prohibit discrimination in

---

[9]   Section 3604 provides in pertinent part:

[I]t shall be unlawful-
   . . . .
(f)  (1)  To discriminate in the sale or rental, or to
          otherwise make unavailable or deny, a dwelling to
          any buyer or renter because of a handicap of-

          (A) that buyer or renter,
          (B) a person residing in or intending to reside in
          that dwelling after it is so sold, rented, or made
          available; or
          (C) any person associated with that buyer or
          renter.

     (2) To discriminate against any person in the terms,
         conditions, or privileges of sale or rental of a
         dwelling, or in the provision of services or
         facilities in connection with such dwelling,
         because of a handicap of—

the national housing market for handicapped[10] individuals.  As

the House Report stated,

> The Fair Housing Amendments Act . . . is a clear
> pronouncement of a national commitment to end the
> unnecessary exclusion of persons with handicaps from the
> American mainstream.  It repudiates the use of stereotypes
> and ignorance, and mandates that persons with handicaps be
> considered as individuals.  Generalized perceptions about
> disabilities and unfounded speculations about threats to
> safety are specifically rejected as grounds to justify
> exclusion.

H.R. REP. NO. 100-711, at 18 (1988), reprinted in 1988

U.S.C.C.A.N. 2173, 2179.

---

(A) that person; or
(B) a person residing in or intending to reside in
that dwelling after it is so sold, rented, or made
available; or
(C) any person associated with that person.

   (3) For purposes of this subsection, discrimination
       includes—
   . . .
       (B) a refusal to make reasonable accommodations in
       rules, policies, practices, or services, when such
       accommodations may be necessary to afford such
       person equal opportunity to use and enjoy a
       dwelling; . . . .

42 U.S.C § 3604(f)(1),(2),(3)(B).

[10]  In relevant part, 42 U.S.C. § 3602(h) provides:

(h)  "Handicap" means, with respect to a person—
   (1)  a physical or mental impairment which substantially
        limits one or more of such person's major life
        activities,
   (2)  a record of having such an impairment, or
   (3)  being regarded as having such an impairment.

42 U.S.C. § 3602(h).

16

Expanding on the previously enacted Fair Housing Act (FHA),[11] which prohibited discrimination in housing based on race, color, religion, and national origin,[12] the FHAA responded to a recognized prejudice against those with physical disabilities and illness and against "[p]eople with mental retardation [who] have been excluded because of stereotypes about their capacity to live safely and independently." See id. (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 435 (1985) (which held that there was no rational basis for a zoning ordinance that had the effect of excluding citizens with mental retardation from living in the community)). As in Cleburne, Congress took particular note of how local zoning laws had been used to discriminate and thus affect housing opportunities for the disabled:

> These new subsections would also apply to state or local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities.

---

[11] See Fair Housing Act of 1968, Pub. L. No. 90-284, 82 Stat. 81 (codified as amended at 42 U.S.C. §§ 3601-3631 (1994)).

[12] In 1974, Congress amended the Fair Housing Act to prohibit discrimination on the basis of sex. See Pub. L. No. 93-383, 88 Stat. 83 (1974).

17

H.R. Rᴇᴘ. Nᴏ. 100-711, at 24, reprinted in 1988 U.S.C.C.A.N. 2173, 2185 (emphasis added).[13]

The "reasonable accommodations" language, now codified in 42 U.S.C. § 3604(f)(3)(B), specifically targeted the type of zoning regulations at issue here. Congress found that these seemingly "neutral rules and regulations," even those involving commercial/ noncommercial zoning distinctions, nonetheless had a discriminatory effect on the housing choices available for the disabled. See id. ("The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices."). Primarily, the discriminatory effect recognized by Congress resulted from the fact that the disabled were not able to live safely and independently without organized, and sometimes commercial, group homes like the one at issue.[14]

---

[13] Section 3604 also governs organizations like Groome Resources that provide services to the disabled. See 42 U.S.C. § 3604(a)-(f).

[14] In Cleburne, which informed the passage of the FHAA, the Supreme Court adopted this circuit's findings that "without group homes . . . the retarded could never hope to integrate themselves into the community." 473 U.S. at 438 (citing Cleburne Living Ctr., Inc., v. City of Cleburne, 726 F.2d 191, 193 (5th Cir. 1984)). The Fifth Circuit's findings, in turn, were informed by the district court's findings, which go directly to the issue here regarding the importance of commercially run homes for handicapped individuals,

"Group homes currently are the principal community living alternatives for persons who are mentally retarded. The availability of such a home in communities is an essential ingredient of normal living patterns for persons who are

18

In the scheme of the FHAA, the reasonable accommodations provision exists as a prohibition on discrimination against the disabled in the purchase, sale, or rental of housing.  As set out in § 3604(f)(3)(B), the failure to reasonably accommodate the disabled in the context of housing is, itself, a defined act of discrimination.  The question before this court is whether the activity of regulating discrimination against the disabled in the purchase, sale, or rental of housing can be shown to substantially affect interstate commerce, and therefore be upheld as a legitimate exercise of congressional authority.

B. Congressional Authority Under the Commerce Clause

The Commerce Clause grants Congress the constitutional authority "'to regulate Commerce . . . among the several states,' and [] concomitant power to protect the nation's commerce by enacting such laws as it deems 'necessary and proper.'"  United

---

mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community."

Cleburne, 473 U.S. at 439 n. 6 (quoting Cleburne, 726 F.2d at 193).  Other circuits have recognized that commercial group homes may be the only way for disabled individuals to live in a residential community: "As the Court of Appeals for the Sixth Circuit has observed, 'the handicapped may have little choice but to live in a commercial home if they desire to live in a residential neighborhood." Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1105 (3d Cir. 1996)  (quoting Smith & Lee Assocs., Inc. v. City of Taylor, Mich., 13 F.3d 920, 931 (6th Cir. 1993)).

19

States v. Robinson, 119 F.3d 1205, 1209 (5th Cir. 1997) (quoting U.S. CONST. art. I, § 8, cl. 3, 18).

In interpreting the commerce power, courts are bound both by the "first principles" of a Constitution that establishes a federal government with "enumerated powers," and our judicial role, which requires deference to properly enacted congressional regulations. See Lopez, 514 U.S. at 552, 556. As Judge Higginbotham recognized in United States v. Kirk,

> On the one hand, courts have a constitutional duty to scrutinize congressional actions to ensure that Congress stays within its constitutionally enumerated powers; if Lopez means anything, it is that Congress's power under the Commerce Clause must have some limits. On the other hand, we must discipline our scrutiny to ensure that we are about the business of judicial review and not the business of social policy. Stated another way, respecting the policy-making role of majoritarian legislative bodies is not an empty recitation.

105 F.3d 997, 999 (5th Cir. 1997) (equally divided en banc court) (citations and internal quotation marks omitted). Thus, while recognized as "one of the most prolific sources of national power," H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 534 (1949), the commerce power is cabined within constitutionally determined "outer limits." See United States v. Morrison, 120 S. Ct. 1740, 1748-49 (2000) (citing United States v. Lopez, 514 U.S. 549, 556 (1995)) ("Lopez emphasized . . . that even under our modern, expansive interpretation of the Commerce Clause, Congress' regulatory authority is not without effective bounds.").

20

We turn first to the framework establishing those outer limits.  In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test as interpreted by the Lopez court.  See, e.g., Robinson, 119 F.3d at 1210; United States v. Bailey, 115 F.3d 1222, 1225 (5th Cir. 1997); United States v. Knutson, 113 F.3d 27, 29 (5th Cir. 1997); United States v. Bird, 124 F.3d 667, 673 (5th Cir. 1997); United States v. Coleman, 78 F.3d 154, 159 (5th Cir. 1996).  Our analysis is, therefore, guided by this precedent and the constitutional principles set forth in Lopez[15] and elucidated in the Supreme Court's recent discussion in Morrison.[16]

## 1. Commerce Clause After Lopez: Three Categories of Interstate Activity

The Lopez Court described "three broad categories of activity" that Congress may regulate pursuant to its Commerce Clause power.  See Lopez, 514 U.S. at 558.  "First, Congress may regulate the use of the channels of interstate commerce."  Id.

---

[15] Lopez invalidated the Gun Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which made it a federal crime to knowingly possess a firearm in a school zone.  See 514 U.S. at 552.

[16] Morrison invalidated the federal civil remedy provision of the Violence Against Women Act of 1994, 42 U.S.C. § 13981(b). The Supreme Court found that Congress lacked the constitutional authority to enact the section's civil remedy, finding neither Commerce Clause authority nor authority under § 5 of the Fourteenth Amendment.  See 120 S. Ct. at 1754.

21

(citing United States v. Darby, 312 U.S. 100, 114-15 (1941) and Heart of Atlanta Motel v. United States, 379 U.S. 241, 256 (1964)). "This category extends beyond the regulation of highways, railroads, air routes, navigable rivers, fiber-optic cables and the like." Robinson, 119 F.3d at 1210. This category was one of the categories used to prohibit racial discrimination in public accommodations and has been used to prevent illicit goods from traveling through the channels of commerce. See id. (citing Heart of Atlanta Motel, 379 U.S. at 256).

"Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." Lopez, 514 U.S. at 558 (citing Shreveport Rate Cases, 234 U.S. 342 (1914), S. Ry. Co. v. United States, 222 U.S. 20 (1911), and Perez v. United States, 402 U.S. 146 (1971)). "Congressional regulation or protection of persons or things that move in interstate commerce must ensure that, in fact, a particular threat — whether posed by an interstate or intrastate activity — actually threatens persons or things with a plain and clear nexus to interstate commerce." Bird, 124 F.3d at 674.

"Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." Lopez, 514 U.S. at 558-59 (citing

22

NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937), and

Maryland v. Wirtz, 392 U.S. 183 (1968)).  This category includes

two separate analytical components: first, whether the regulated

activity involves "commerce" or "economic" activity and, second,

whether the regulation is "an essential part of a larger

regulation of economic activity."  Id. at 561.  As will be

discussed in more detail below, Morrison further refined this

third category of interstate activity.

In delineating these categories, the Lopez Court also

reaffirmed traditional principles of Commerce Clause

jurisprudence.  See United States v. Knutson, 113 F.3d 27, 29

(5th Cir. 1997) ("In [Lopez] the Court identified an outer limit

to congressional authority under the Commerce Clause; . . . the

Court did not purport to eliminate or erode well-established

Commerce Clause precedents.").  More specifically, the Lopez

Court reaffirmed the rational basis test by which we are bound to

evaluate the constitutionality of congressional actions.  See

Lopez, 514 U.S. at 557 (recognizing the duty of courts to

evaluate whether "a rational basis exist[s] for concluding that a

regulated activity sufficiently affect[s] interstate commerce").

Further, this circuit has interpreted Lopez as reaffirming "the

proposition set forth in Wickard v. Filburn[17] concerning

_____

[17]  317 U.S. 111, 125 (1942) ("[E]ven if appellee's activity
be local and though it may not be regarded as commerce, it may
still, whatever its nature, be reached by Congress if it exerts a
substantial economic effect on interstate commerce.").

congressional regulation of intrastate, noncommercial activity."
United States v. Bird, 124 F.3d 667, 676 (5th Cir. 1997) ("After
Wickard — and its reaffirmance in Lopez — there can be no
question that Congress is able to regulate noncommercial,
intrastate activity that substantially affects interstate
commerce.").

## 2. Commerce Clause After Morrison: Refinement of Lopez's Third Category of Permissible Congressional Regulation

In Morrison, the Supreme Court clarified this circuit's
interpretation of Lopez and provided further analytical guidance
as to the third category of activity — "substantially affecting
interstate commerce."  The Morrison Court looked to four
additional factors to determine whether the congressional act at
issue exceeded the scope of its constitutional authority.

First, the Court considered the "economic nature of the
regulated activity."  See Morrison, 120 S. Ct. at 1750 ("'Where
economic activity substantially affects interstate commerce,
legislation regulating that activity will be sustained.'")
(quoting Lopez, 514 U.S. at 560).  The Court emphasized the
economic or commercial character of previous Commerce Clause
cases.  See id. (collecting cases).  The Court found that in both
Lopez and Morrison, neither the "actors" nor the "conduct" of the
regulation had a commercial character, and neither the "purpose"

24

nor the "design" of the statute had an evident commercial nexus. See id.

Second, the Morrison court determined that the lack of an express jurisdictional element in the Lopez statute weakened the claim that Congress was acting within its Commerce Clause powers. See id. at 1750-51 ("Such a jurisdictional element may establish that the enactment is in pursuance of Congress' regulation of interstate commerce.").

Third, the Court found that while Congress was not required to make formal findings, "the existence of such findings may 'enable us to evaluate the legislative judgment that the activity in question substantially affect[s] interstate commerce, even though no such substantial effect [is] visible to the naked eye.'" Id. at 1751 (quoting Lopez, 514 U.S. at 553).

Finally, the Court cautioned against accepting an "attenuated" connection between the regulation and the interstate activity. See id. Concerned that causal, "but-for" arguments could lead to an evisceration of any limitations on federal power, the Court held Congress to a more direct link.

With these interpretive principles in mind, we now turn to analyze the Parish's challenge to the reasonable accommodations provision of the FHAA. Our task is to determine whether Congress had a rational basis, as defined by Lopez-Morrison, to enact § 3604(f)(3)(B).

## C. The FHAA Substantially Affects Interstate Commerce and Is Constitutional Under a Lopez-Morrison Analysis

The Parish argues that none of the Lopez categories would provide Congress the authority to enact the FHAA. We agree that the first and second Lopez categories, involving the use of the channels of interstate commerce, and instrumentalities of interstate commerce are inapplicable here. It is the third Lopez category, involving activities that substantially affect interstate commerce, on which we base our rejection of the Parish's Commerce Clause argument. To reach our conclusion, we analyze each of the four additional Morrison factors in turn.

## 1. The Reasonable Accommodations Provision Regulates Economic Activity Involving the Purchase, Sale, or Rental of Housing

Under Lopez-Morrison, to figure out whether an activity substantially affects interstate commerce, the first question we must ask is whether the regulated activity is an activity economic in nature. See 120 S. Ct. at 1750 ("[The Court's] review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."). This query derives from the general Lopez requirement that the regulated intrastate activities, "arise out of or are connected with a commercial transaction,

26

which viewed in the aggregate, substantially affects interstate commerce." Lopez, 514 U.S. at 561.

More specifically, the first Morrison question regarding "economic" activity, is answered by a close reading of Lopez, which provides two recognized and historically rooted means of congressional regulation under the commerce power: (1) whether the activity is "any sort of economic enterprise, however broadly one might define those terms"; or (2) whether the activity exists as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561. Using these two questions as our analytical framework, we determine under Lopez-Morrison, that Congress acted within its constitutional power to enact the FHAA reasonable accommodations provision.

## a. The Purchase, Sale, or Rental of Residential Housing Is an Economic/Commercial Activity

The Parish argues that the activity being regulated is "wholly non-economic" and presumably non-commercial. We disagree finding that § 3604(f)(3)(B) affected the commercial transaction of purchasing a home and the commercial rental of housing, and, therefore, fits well within the broad definition of economic activity established by the Supreme Court and other circuits.

27

The activity being regulated is one that directly affects the commercial residential and rental housing market. "In every case where we have sustained federal regulation under Wickard's aggregation principle, the regulated activity was of an apparent commercial character." Morrison, 120 S. Ct. at 1750 n.4. A denial of reasonable accommodations affects a disabled individual's ability to buy, sell, or rent housing. It is an act of discrimination that directly interferes with a commercial transaction, and is an act that can be regulated to facilitate economic activity. The Parish's decision to deny Groome Resources a reasonable accommodation, therefore, is directly tied to the economic activity of buying a home, and the commercial activity of operating an Alzheimer's care facility.

As all American homeowners can attest, it is a transparently commercial action to buy, sell, or rent a house. Not only is it quite literally a "commercial transaction," but viewed in the aggregate, it implicates an entire commercial industry.[18] A purchase of a house is "commercial intercourse," Gibbons v.

_____

[18] The residential housing market in the United States is of tremendous economic significance to the national economy. In 1997, the United States Census reported that the single-family housing construction industry was valued at over $146 billion and employed over 570,000 people. See U.S. DEP'T OF COMMERCE, BUREAU OF THE CENSUS: 1997 ECONOMIC CENSUS, CONSTRUCTION, tbl. 3, at 9, tbl. 2, at 8; see also United States v. Patterson, 792 F.2d 531, 534 (5th Cir. 1986) ("Housing construction is certainly a commercial activity."). Further, residential real estate lessors, agents, brokers, and managers had revenues of over $91 billion. See U.S. DEP'T OF COMMERCE, BUREAU OF THE CENSUS: 1997 ECONOMIC CENSUS, REAL ESTATE AND RENTAL AND LEASING, tbl. 1, at 7.

28

Ogden, 22 U.S. (9 Wheat.) 1, 193 (1824), at its purest form, involving capital outlay, financing and mortgage arrangements, profit, debt and investment considerations, and thus speaks to both the "commercial character" and economic nature of the transaction.[19]

In the instant case, not only are we faced with a commercial transaction, but an interstate commercial transaction. Groome Resources, a New Orleans-based limited liability partnership, contracted to purchase a house from Cendant Mobility Services Corporation, a national relocating company. This interstate purchase was financed by an interstate lender, Whitney National Bank. Most importantly, this interstate commercial transaction was impeded by an act of housing discrimination — namely the Parish's failure to reasonably accommodate disabled individuals wishing to live in a group home. Therefore, as a factual matter, Groome Resources' proposed purchase of rental property to be used as a group home satisfies the requirement that we are confronting a commercial and economic activity.

The commercial nature of this activity is further strengthened by the fact that Groome Resources exists as a for-

---

[19] Moreover, most housing purchases involve realtors, brokers, title insurance, title registration and legal fees, and may involve federally backed mortgages and the secondary mortgage market. In addition to supporting the commercial nature of a housing purchase, many of the above factors also involve actors with interstate ties. See McLain v. Real Estate Bd. Inc., 444 U.S. 232, 245 (1980); Goldfarb v. Va. State Bar, 421 U.S. 773, 785 (1975).

profit entity providing rental housing to its clients and is, thus, itself a commercial actor.[20]  The Supreme Court has recently ratified our understanding of both the commercial and interstate nature of renting real property.  The Court's decisions in <u>Jones v. United States</u>, 120 S. Ct. 1904 (2000) and <u>Russell v. United States</u>, 471 U.S. 858 (1985) make clear that renting and otherwise using housing for commercial purposes implicates the federal commerce power.[21]

In <u>Russell</u>, the defendant was convicted of attempting to burn down an apartment complex from which he earned rental income.  He challenged his conviction stating that the building was not commercial or business property and, thus, not an activity affecting interstate commerce.  The Court found that "[t]he rental of real estate is unquestionably" an "activity that affects commerce."  <u>Russell</u>, 471 U.S. at 862.  The Court found

---

[20]  In addition to the commercial aspect of purchasing the home, it must be noted that the granting of reasonable accommodations to Alzheimer's group homes and other homes for disabled individuals also affects the commercial viability of care organizations like Groome Resources.  The district court found that the zoning ordinance, with its limitation on four unrelated persons, "will make it economically unfeasible for plaintiff to operate the proposed home."  The court recognized that the economic viability of this care facility was impeded by the refusal to grant an accommodation.

[21]  In both cases, the Court was confronted with the statutory reach of the federal arson statute, 18 U.S.C. § 844(i), which prohibits the damage or destruction "by means of fire or an explosive, any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  18 U.S.C. § 844(i) (2000).

dispositive the existing "commercial market" in rental property as the justification for congressional power to criminalize ostensibly local arson:

> [We] recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.

Id.[22] This recognition was reaffirmed in the recent Jones decision.

In Jones, the Court reversed and remanded a conviction based on § 844(i) involving the fire-bombing of a private residence. The Court held that "an owner-occupied residence not used for any commercial purpose does not qualify as property 'used in' commerce or commerce-affecting activity." Jones, 120 S. Ct. at 1908. The Jones Court distinguished Russell, finding that the dispositive fact in that case was that "[p]etitioner was renting his apartment building to tenants at the time he attempted to destroy it by fire." Id. at 1909 (quoting Russell, 471 U.S. at 862)[23]; see also United States v. Corona, 108 F.3d 565, 570-71

---

[22] The Court relied on the arson statute's legislative history to find that the purpose of the statute, "suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." Russell, 471 U.S. at 862.

[23] The Jones Court also posited a functionality test to determine whether arson of a building is a commerce-affecting act. The Court held that "[t]he proper inquiry . . . is into the function of the building itself, and then a determination of

31

(5th Cir. 1997) (upholding § 844(i) conviction and stating, "[w]e find that these convictions comport with the Commerce Clause because of the fact that the fire spread to the United Cab warehouse. . . . Not only was the . . . property actually being rented, but it was serving a commercial rather than a residential purpose.").

In each of these cases, congressional authority for regulation rested on the rental or commercial use of the property. As the Groome Resources group home was both a rental property charging monthly rent to its clients and a commercial operation, we find that the home's commercial use "unquestionably" is an "activity that affects commerce."[24] The failure to grant a reasonable accommodation to the home is an act

---

whether that function affects interstate commerce." Jones, 120 S. Ct. at 1910. In the instant case, the house is functioning as a rental unit for disabled individuals, which under Russell can be regulated under the commerce power.

[24] We are mindful of Justice Souter's dissenting admonition that the Morrison majority had created an unworkable "formalistic economic/noneconomic distinction." 120 S. Ct. at 1768 (Souter, J., dissenting). While we need not resolve this problem in a factual situation that presents no such issue, the logic of the Jones/Morrison court could suggest that Congress has the constitutional authority to regulate discrimination against the disabled in housing that is rented or otherwise used for commercial purposes, but not regulate the sale or purchase of a home to be used for private uses by the disabled. Of course, the regulated activity of arson in Jones is readily distinguishable from the purchase or sale of a house. In future cases, however, courts may be called upon to resolve the issue of whether housing discrimination involving purely private actors for private, non-commercial use, substantially affects interstate commerce more than arson and, thus, confront the categorical logic of Jones/Morrison.

of discrimination against the disabled that frustrated an interstate commercial transaction, and affected a commercial endeavor. Therefore, while not dispositive, these cases support the conclusion that we are dealing with a commercial activity that falls within the purview of Congress's regulatory authority.[25]

We are further supported in our determination that discrimination infringing on the rental, purchase, and sale of real estate is activity "economic in nature," by the broad reading given to "economic activity" by other courts. Most recently, the Morrison Court provided an expansive reading of economic activity that affected interstate commerce, including as it did Wickard's regulation of homegrown and home-consumed wheat. See 120 S. Ct. at 1750; see also Lopez, 514 U.S. at 574 (recognizing our evolution from "an understanding of commerce

---

[25] The Supreme Court has also permitted congressional regulation of the interstate sale of real property through the Sherman Act. In Goldfarb v. Va. State Bar, the Court relied on the interstate nature of real estate title examinations to find that the Sherman Act applied to minimum fee schedules. See 421 U.S. 773, 785 (1975) ("Given the substantial volume of commerce involved, and the inseparability of this particular legal service from the interstate aspects of real estate transactions, we conclude that interstate commerce has been sufficiently affected."). Similarly, the Court found Sherman Act jurisdiction against real estate firms and brokers, because "[i]t is clear that an appreciable amount of commerce is involved in the financing of residential property . . . and in the insuring of titles to such property. . . [and] this appreciable commercial activity has occurred in interstate commerce." McLain v. Real Estate Bd. Inc., 444 U.S. 232, 245 (1980).

33

that would serve only an 18th century economy"); United States v. Bailey, 115 F.3d 1222, 1228 n.7 (5th Cir. 1997) ("The construction of the term 'commerce' is a practical one and embraces economic activity beyond that which is traditionally considered commerce.").

A broad reading of "economic" has been accepted in other circuits that have addressed the Commerce Clause after Morrison. For example, the Court of Appeals for the Fourth Circuit in Gibbs v. Babbitt upheld a federal statute limiting the taking of red wolves on private lands based on the economic consequences of the activity, including its effect on "red wolf related tourism," "scientific research," and "commercial trade in pelts." See 214 F.3d 483, 492 (4th Cir. 2000). The court recognized the "breadth" of the concept of economic activity,

> Although the connection to economic or commercial activity plays a central role in whether a regulation will be upheld under the Commerce Clause, economic activity must be understood in broad terms. Indeed, a cramped view of commerce would cripple a foremost federal power and in so doing would eviscerate national authority.

Id. at 491; see also United States v. Gregg, 226 F.3d 253, 262 (3d Cir. 2000)[26] ("We thus hold that although the connection to economic or commercial activity plays a central role in whether a

---

[26] In a post-Morrison case, the Gregg court upheld the constitutionality of the Freedom of Access to Clinic Entrances Act (FACE) against a Commerce Clause challenge based on a rationale that "the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic." 226 F.3d at 262.

law is valid under the Commerce Clause, we hold that economic activity can be understood in broad terms.").

This circuit has also recognized a broad reading of commercial and economic activities under the Commerce Clause. See Bailey, 115 F.3d at 1228 n.7 (finding, under the Child Support Recovery Act, that "[c]hild support obligations and their ensuing payments constitute economic activity and are thus properly the subject of Commerce Clause regulation"); United States v. Threadgill, 172 F.3d 357, 372 (5th Cir. 1999) (holding that 18 U.S.C. § 1955, prohibiting illegal gambling, and 31 U.S.C. § 5324, prohibiting unlawful structuring of a currency transaction to evade reporting, could be regulated under the Commerce Clause because both regulate "purely commercial activities"); United States v. Bird, 124 F.3d 667, 682 (5th Cir. 1997) (upholding a Commerce Clause challenge to the Freedom of Access to Clinic Entrances Act on the grounds that Congress could "ensure the availability of abortion-related services in the national commercial market"); United States v. Coleman, 78 F.3d 154, 159 (5th Cir. 1996) (upholding federal car-jacking statute because such "forms of auto theft are crucial to the interstate commerce of stolen automobiles and auto parts").

As a final point, we must emphasize that in the context of the strong tradition of civil rights enforced through the Commerce Clause — a tradition in which the FHAA firmly sits — we have long recognized the broadly defined "economic" aspect of

35

discrimination. As the Supreme Court stated in <u>Heart of Atlanta</u>

<u>Motel, Inc. v. United States</u>,

> In framing Title II of [The Civil Rights Act of 1964]
> Congress was also dealing with what it considered a moral
> problem. But that fact does not detract from the
> overwhelming evidence of the <u>disruptive effect that racial</u>
> <u>discrimination has had on commercial intercourse</u>. It was
> this burden which empowered Congress to enact appropriate
> legislation.

379 U.S. 241, 257 (1964) (emphasis added); <u>see also</u> <u>United States</u>

<u>v. Hickman</u>, 179 F.3d 230, 236 (5th Cir. 1999) (Higginbotham, J.,

dissenting from the affirmance of the district court's judgments

by an equally divided court) (discussing <u>Heart of Atlanta Motel</u>,

"[t]hat this economic regulation also had the goal — even a

larger goal — of undermining a racist social norm does not defeat

its constitutionality").[27] As long as there is recognition of an

---

[27] The economic effect of housing discrimination against the disabled is equivalent to the economic effect of racial discrimination in 1964. In fact, parallels were overtly recognized in the congressional debates leading to the passage of the FHAA. For example, in proposing to extend FHA protection to handicapped individuals, Representative Peter W. Rodino stated on the House floor, "I believe . . . [the FHAA] is the logical and necessary next step in our attempt to deal with housing discrimination. The effort that we began 1966 must be completed, so that all Americans can be assured of freedom of choice in choosing their homes." 134 CONG. REC. H4604 (1988). The powerful words denouncing the local discrimination in <u>Katzenbach v.</u> <u>McClung</u>, therefore are equally relevant to our present situation,

> [W]hile the focus of the legislation was on the individual
> [actor's] relation to interstate commerce, Congress
> appropriately considered the importance of that connection
> with the knowledge that the discrimination was but
> representative of many others throughout the country, the
> total incidence of which if left unchecked may well become
> far-reaching in its harm to commerce.

interstate effect, discrimination, even local discrimination, can be regulated under Congress's commerce power.  See <u>Heart of Atlanta Motel</u>, 379 U.S. at 258.

As the FHAA in general, and the reasonable accommodations provision in particular, prohibit discriminatory actions in the purchase, sale, or rental of housing — commercial transactions that have an obvious economic impact — we are satisfied that the activity regulated is economic in nature.

### b.   Congress May Regulate National Markets

Alternatively, the <u>Lopez</u> Court provided a second, related analytical means to justify congressional regulation of intrastate activity that affects the national market.  <u>See</u> 514 U.S. at 574 ("Congress can regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.") (Kennedy, J., concurring).[28]  The Court held that regulation is sustainable if it exists as "an essential part of a larger regulation of

---

379 U.S. 294, 301 (1964) (citations and internal quotation marks omitted).

[28]   The <u>Morrison</u> Court did not analyze this aspect of <u>Lopez</u>, as there exists no "national market" to protect women from violence.  The Court did, however, cite to Justice Kennedy's concurrence in <u>Lopez</u>, recognizing this means of analysis.  <u>See</u> <u>Morrison</u>, 120 S. Ct. at 1750 ("<u>Lopez</u> did not alter our 'practical conception of commercial regulation' and that Congress may 'regulate in the commercial sphere on the assumption that we have a single market and a unified purpose to build a stable national economy.'").

37

economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561; see also Hickman, 179 F.3d at 231 (Higginbotham, J., dissenting) ("Of course, Congress may protect, enhance, or restrict some particular interstate economic market, such as those in wheat, credit, minority travel, abortion service, illegal drugs, and the like, and Congress may regulate intrastate activity as part of a broader scheme."); Bird, 124 F.3d at 682.

This understanding of the Commerce Clause power has a long lineage in the Supreme Court's jurisprudence,

> A complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test.

Hodel v. Indiana, 452 U.S. 314, 329 n.17 (1981) (collecting cases); see also Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 803 (1976) (recognizing "the premise, well established by the history of the Commerce Clause, that this nation is a common market"); Gibbs v. Babbitt, 214 F.3d 483, 497 (4th Cir. 2000) (recognizing same in post-Morrison case).

In the context of fair housing, Congress has manifested its plain intent to prohibit discrimination in the national market for housing. See 42 U.S.C. § 3601 ("It is the policy of the United States to provide within constitutional limitations, for fair housing throughout the United States."(emphasis added)).

38

Congress acted in response to the recognition that in a mobile society in which people and families move within states and localities, and where local land use laws affect the movement of people, there is a national effect on housing materials, economic development, and growth of certain restricted areas.[29]  The reasonable accommodations provision is but one means by which to prevent housing discrimination against disabled individuals, and thus, one means to counteract the economic effect of housing discrimination at the national level.

"Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class."  Perez v. United States, 402 U.S. 146, 154 (1971).  Therefore, the Parish's challenge to the reasonable accommodations provision must be evaluated in the context of the entire statute.  See Lopez, 514 U.S. at 558 ("Where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." (quoting Maryland v. Wirtz, 392 U.S. 183, 197 (1968)).  Undertaking that analysis, we are satisfied that since § 3604 affects the interstate market for housing, we must uphold the individual provisions of the statute.

---

[29]  See infra notes 34 & 35.

In similar fashion, the national regulation of fair housing also undermines the Parish's "local land use" argument.  Local efforts to exclude the disabled from the community by refusing to provide reasonable accommodations to zoning laws, may be regulated on a federal level if that local refusal affects the national economy.  See Heart of Atlanta Motel, 379 U.S. at 258 ("[I]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." (citations omitted)).  Thus, that the act of discrimination takes place on a local stage is of no moment, because when Congress has chosen a national arena to regulate, every actor that affects commerce is subject to regulation.

Because the Parish's decision to deny Groome Resources a reasonable accommodation is inextricably tied to the economic activity of buying a home and the commercial activity of operating a rental-based Alzheimer's care facility, and the culmination of many such activities could rationally be determined to have a substantial effect on the national housing market, we find that under the Lopez-Morrison rational basis test, Congress acted within its Commerce Clause authority.

Therefore, under both of the recognized means of regulation analyzed in Lopez, we find Morrison's first question — of whether the activity is economic or commercial in nature — to be satisfied.

40

## 2. There Is No Express Jurisdictional Element

As the FHAA has no express jurisdictional element, we need not belabor this second prong of the Morrison analysis. See Morrison, 120 S. Ct. at 1750-51 (finding that a jurisdictional element could assist constitutional interpretation by providing "an explicit connection with or effect on interstate commerce"); see also Lopez, 514 U.S. at 561-62 (requiring a jurisdictional element to facilitate a "case-by-case inquiry" into the interstate "nexus").

We do note, however, that the requirement of a jurisdictional element in both Morrison and Lopez is relevant only because there was no obvious interstate economic connection in those cases, involving as they did, non-economic and intrastate activities. While we do not rest our holding on this factor, the explicit economic nature of commercial housing used for rental purposes and the economic effect of discrimination on the national housing market (as detailed above) presents a very different situation than cases challenging non-economic and non-commercial regulatory acts.

## 3. The Legislative History of the FHAA Supports the Interstate Nature of the Reasonable Accommodations Provision

The third prong of Morrison asks whether the legislative history of the Act provides insight into the "legislative judgment that the activity in question substantially affects

41

interstate commerce, even though no such substantial effect is visible to the naked eye." 120 S. Ct. at 1751. As is evidenced by the interstate, economic nature of housing discrimination discussed previously, we are not dealing with an invisible effect.

Nevertheless, following the dictates of <u>Morrison</u>, we find the legislative action that resulted in the passage of the FHAA to have recognized a pattern of discrimination that affected the interstate housing market and the creation of commercial group homes for handicapped individuals. The passage of the FHAA in 1988 was the culmination of eight years of congressional discussion on the topic of discrimination against the disabled.[30] Hearings on the subject were held in 1979,[31] 1986,[32] and 1988.[33]

---

[30] <u>See</u> H.R. REP. NO. 100-711, at 14-15 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 2175-76 (detailing the history of the FHAA since 1980); <u>see</u> <u>also</u> 134 CONG. REC. H4604 (1988) (statement of Rep. Rodino) ("The second historic feature of the bill is its inclusion of handicapped persons and families with children within Title VIII coverage. <u>We knew of the plight of the handicapped when we voted to pass the Fair Housing Amendments Act of 1980.</u>" (emphasis added)).

[31] <u>See</u> <u>Fair Housing Amendments Act of 1979: Hearing on H.R. 2540 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary</u>, 96th Cong. 1-697 (1979).

[32] <u>See</u> <u>Fair Housing Amendments Act: Hearing on H.R. 4119 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary</u>, 99th Cong. 1-309 (1986).

[33] <u>See</u> <u>Fair Housing Amendments Act of 1987: Hearing on H.R. 1158 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary</u>, 100th Cong. 1-699 (1987); <u>Fair Housing Amendments Act: Hearing on S. 558 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary</u>, 100th

Citizens, advocates, and government officials testified as to the nature of the problem.[34] Congress even requested legal briefing on the interstate nature of the discrimination.[35]

_____

Cong. 1-837 (1987).

[34] See Hearing on H.R. 2540, 96th Cong. 3-14 (1979) (statement of Drew S. Days, III, Assistant Attorney General, Civil Rights Division, Department of Justice); id. at 515-23 (statement of Willia Knighton, Consortium Concerned with the Developmentally Disabled); id. at 625-27 (statement of Jay Dystel, Director of Advocacy, American Coalition of Citizens with Disabilities); id. at 645-81 (statement from Congressional Research Service on "Legal Analysis of Issues Relating to Draft Legislation Amending the Fair Housing Act to Prohibit Discrimination Against Handicapped Persons"); Hearing on H.R. 4119, 99th Cong. 53-62 (1986) (statement of the Honorable Hamilton Fish, Jr.); id. at 100-10 (statement of Bonnie Milstein, Civil Rights Task Force, Consortium of Citizens with Developmental Disabilities); id. at 247-51 (statement of Sharon Mistler); id. at 257-62 (statement of David M. Capozzi, Associate Advocacy Director, Paralyzed Veterans of America); Hearing on H.R. 1158, 100th Cong. 40 (1987) (statement of the Honorable Don Edwards); id. at 42-44 (statement of Peter W. Rodino, Jr., Chairman, Committee on the Judiciary, U.S. House of Representatives); id. at 571-84 (statement of Edward Roberts, President, World Institute on Disability); Hearing on S. 558, 100th Cong. 3-5 (statement of Senator Edward M. Kennedy); id. at 95-102 (statement of Marcia Bristo, President, National Centers on Independent Living); id. at 376-80 (statement of Michael Wilson, Member, Public Policy Committee, National Mental Health Association).

[35] See Hearing on H.R. 2540, 96th Cong. 645-81 (1979) (statement from Congressional Research Service on "Legal Analysis of Issues Relating to Draft Legislation Amending the Fair Housing Act to Prohibit Discrimination Against Handicapped Persons"). The report found:

Discrimination against the handicapped as prohibited by the proposed Fair Housing Amendments of 1979 (draft legislation) would in all probability have some effect upon interstate commerce, especially in view of the mobility of persons in this country. Persons are constantly moving to and from States and most families live in several different localities during their lifetimes. State and local land use

43

While the final 1988 Amendments were passed without formal findings, as this court recognized in the context of the federal regulation of machine guns, congressional findings, even if not explicitly reiterated in each incarnation of the legislation, "clearly subsist in the cumulative memory of Congress." United States v. Knutson, 113 F.3d 27, 30 (5th Cir. 1997). This memory includes not only the anti-discriminatory purpose of the FHAA, but also the FHA. See Seniors Civil Liberties Ass'n v. Kemp, 965 F.2d 1030, 1034 (11th Cir. 1992) ("Congress had ample evidence before it, and was adequately aware, that its exercise of power under the Fair Housing Act was supported by the Commerce Clause.").[36] As Senator Weicker stated on the floor of the

and housing controls which discriminate against handicapped persons keep such persons from living in particular areas or cause them to reside in discrete, undesirable areas thus obstructing the flow of housing materials as well as persons across state lines. Specific acts of such discrimination, when magnified to a general trend, affect commercial dealings, practices and opportunities in interstate commerce.

Id. at 676.

[36] The legislative record of the FHA regarding the effect of discrimination on interstate commerce, and thus Congress's authority to regulate that discrimination is well established. See Fair Housing Amendments Act of 1969: Hearings on S. 1358, S. 2114, S. 2280 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking and Currency, 90th Cong. 7 (1969) (statement of Ramsey Clark, Attorney General of the United States) ("I clearly think under the commerce clause the United States has the power delegated to it to rid the Nation of this evil [racial discrimination] which so affects our commerce and the lives of our citizens through our commerce."); id. at 14 (prepared brief by Attorney General of the United States) ("Discrimination in housing affects this interstate commerce in

44

Senate, the FHAA legislation was introduced "to provide comprehensive civil rights protections for disabled individuals that are parallel in scope of coverage to existing civil rights laws protecting minorities." 134 CONG. REC. S10552 (1988). As the connection between racial discrimination and its affect on interstate commerce had been established in Heart of Atlanta Motel and McClung, Congress was well within its institutional authority to act to prevent discrimination against the disabled.

Lopez directs us to "consider legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." 514 U.S. at 563.[37] However, the Court

---

several ways. The confinement of Negroes and other minority groups to older homes in ghettoes restricts the number of new homes which are built and consequently reduces the amount of building materials and residential financing which moves across state lines. Negroes, especially those in the professions or in business, are less likely to change their place of residence to another state when housing discrimination would force them to move their families into ghettoes; the result is both to reduce the interstate movement of individuals and to hinder the efficient allocation of labor among the interstate components of the economy. The Commerce Clause grants Congress plenary power to protect interstate commerce from adverse effects such as these."); id. at 129 (statement of Rev. Robert F. Drinan, Dean, Boston College Law School) (discussing power of Congress under the Commerce Clause).
    Testimony on the FHAA also demonstrated that handicapped and mentally ill individuals are segregated in housing options that do not provide an equal opportunity in housing. See supra note 34.

[37] The Commerce Clause was explicitly referenced in the Senate debates on the FHAA, albeit in terms of the regulation of housing construction to fit the special needs of the disabled.
    The debate between Senator Symms and Senator Specter demonstrates the concern over this issue:

45

also recognized, "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce."  Id.

In the instant case, we are satisfied that the legislative record is replete with informal findings connecting direct discrimination against the disabled with the larger and more subtle effects on the interstate supply of housing.[38]  Congress

---

Mr. Symms. The question that I have, Mr. President, is when we talk about who is enlightened and who is not enlightened, when I look at the building codes in the United States as opposed to the nonmarket countries, we have it way the best, yet we are trying to impose the long nose of the Federal Government into the size of bathrooms.  And my question would be to one of the learned Senators on the floor:  What clause in the Constitution gives the Federal Government the right to go in and set the size of bathrooms and building codes?  Is this in the 13th amendment or is it from the commerce clause in the Constitution?  Where does this come from?  Is this even constitutional?  That is my question.
*   *   *   *   *
Mr. Specter.  Mr. President, I would be delighted to respond to the question.  The commerce clause.
Mr. Symms. The Senator says the commerce clause.  Does the size of bathrooms in multiunit housing affect the commerce clause?
Mr. Specter.  Yes.
Mr. Symms. How?
Mr. Specter.  Because the Commerce Clause touches the construction of housing where the materials passed in interstate commerce.  Where there is a determination by the Congress of the United States that interstate commerce is affected, the decisions by the Supreme Court of the United States are clear that it may reach issues like housing comprehended by this Fair Housing Act.

134 CONG. REC. S10541 (1988).

[38]  Particularly, we note that the legislative record demonstrates a concern about group homes being discriminated against through zoning mechanisms: "[The FHAA] is intended to prohibit special restrictive covenants or other terms or

46

heard testimony about the lack of adequate housing for disabled individuals,[39] the overt discrimination against college students,[40] paralyzed veterans returning home from war,[41] disabled military spouses required to move interstate after their husbands were transferred,[42] and other instances of discrimination that placed burdens on the interstate movement of persons and

---

conditions . . . which have the effect of excluding, for example, congregate living arrangements for persons with handicaps." H.R. REP. NO. 100-711, reprinted in 1988 U.S.C.C.A.N. 2173, 2184; see also Hearing on H.R. 2540, 96th Cong. 29 (1979) (statement of Drew S. Days, III, Assistant Attorney General, Civil Rights Division, Department of Justice) ("[W]e have learned of serious impediments to the establishment of group homes for handicapped persons who are being de-institutionalized. These impediments are raised through the use of land use or occupancy laws. This amendment could be used to attack discriminatory exclusion of handicapped persons in the same way that the present Act is used to attack racially discriminatory land use actions."); Hearing on H.R. 4119, 99th Cong. 108-09 (1986) (statement of Bonnie Milstein, Civil Rights Task Force, Consortium of Citizens with Developmental Disabilities); Hearing on H.R. 1158, 100th Cong. 582 (1987) (statement of Edward Roberts, President, World Institute on Disability) ("Throughout the ten year history of this bill there have been ongoing attempts to provide protections for people living in group homes. These efforts have been undertaken in recognition of the history of obstructionist practices by many local jurisdictions.").

[39] See Hearing on S. 558, 100th Cong. at 95-102 (1987) (statement of Marcia Bristo, President, National Centers on Independent Living) (testifying about the 36 million Americans who have disabilities and the resultant difficulties obtaining housing).

[40] See Hearing on H.R. 4119, 99th Cong. at 257-62 (1986) (statement of David M. Capozzi, Associate Advocacy Director, Paralyzed Veterans of America).

[41] See id.

[42] See id. at 247-51 (statement of Sharon Mistler).

commerce.[43]  This discrimination clearly depressed spending on interstate housing, and imposed an artificial restriction on the market.  See McClung, 379 U.S. at 299.

This testimony, supported by legal briefs discussing Congress's constitutional authority under the Commerce Clause, is sufficient to demonstrate that Congress was acting with considered legislative judgment.  Under a Lopez-Morrison analysis, the legislative record suffices to demonstrate that Congress had a rational basis to prohibit housing discrimination because of its effect on interstate commerce.  We recognize "whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question."  Morrison, 120 S. Ct. 1752 (quoting Lopez, 514 U.S. at 557).  However, on the facts presented, we are satisfied that Congress acted within its constitutional authority in enacting the FHAA.

## 4. The Connection Between the Reasonable Accommodations Provision and Interstate Commerce Is Not Too Attenuated

The final factor for analysis under Morrison is an attenuation analysis.  In Lopez, the Supreme Court rejected the government's attempt to argue that because the possession of guns

---

[43]  See supra note 34.

48

may lead to violent crime, and that crime can affect the national economy by increasing costs through insurance and decreasing "national productivity," there is a connection between possession of guns and interstate commerce. Similarly, in Morrison, the Court reaffirmed that there must be a more direct connection between the regulation of violence against women and interstate commerce. See Morrison, 120 S. Ct. at 1751 ("[In Lopez] [w]e rejected these 'costs of crime' and 'national productivity' arguments because they would permit Congress to 'regulate not only all violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce.").

The attenuation argument in the instant case need not detain us long. Unlike the need for several logical links to connect the regulated activity with commerce as in Lopez and Morrison, here the link is direct. We do not need to pile "inference upon inference" to see that by refusing to reasonably accommodate the disabled by discriminatory zoning laws, there will be less opportunity for handicapped individuals to buy, sell, or rent homes. The attendant financial loss to the economy from Groome Resources' failed attempt to purchase such a house in Louisiana is a case in point.

The testimony presented to Congress well demonstrated that discrimination against the disabled impeded housing rentals, purchases, and interstate travel. Therefore, the regulation of

49

discriminatory policies in the purchase or rental of housing directly affects the housing industry and the economy.  Further, we are bound by the logic of Heart of Atlanta and McClung, where such a link between discrimination and commerce was ratified by the Supreme Court.  See McClung, 379 U.S. at 299-301 (discussing Heart of Atlanta Motel).

## 5. Conclusion on the Commerce Clause

There is, however, a deeper concern embedded in the attenuation analysis that implicates a structural issue of federalism.  The Morrison/Lopez courts were concerned about unbounded federal power, and a concomitant federal invasion into areas of traditional state authority.

We are therefore cognizant and respectful of Morrison's concern with the "distinction between what is truly national and what is truly local."  120 S. Ct. at 1754.  We are persuaded, however, that housing discrimination against the disabled is a national concern that substantially affects the economic health of the nation.  While states and localities retain broad powers to regulate and zone land within their jurisdictions, see Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 393 (1926), this local land use authority cannot defeat congressional action predicated on a nexus between discrimination and commerce.

The discriminatory application of local land use authority implicates the central concern of federalism as articulated by

*Lopez* and *Morrison* — namely that federalizing certain spheres of authority blurs the federal/state distinction, undermining political accountability and impeding local experimentation:

> Federalism serves to assign political responsibility, not to obscure it. . . .   Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory.

*Lopez*, 514 U.S. at 577 (Kennedy, J., concurring) (citations omitted); *see also id.* at 581 ("If a State or municipality determines that harsh criminal sanctions are necessary and wise to deter students from carrying guns on school premises, the reserved powers of the States are sufficient to enact those measures."); *id.* at 583 ("The statute now before us forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise.").

"Our Federalism," however, is not threatened here.  While the incantation of "local zoning" and "traditional" authority is present in this case, in substance, the issue before this court presents no federalism difficulty.  Unlike *Lopez* or *Morrison*, it does not serve the balance of federalism to allow local communities to discriminate against the disabled.  Local authorities cannot "experiment" by creating communities that exclude the disabled any more than local authorities can experiment by excluding minorities.  Further, the FHAA was passed

51

precisely because the political voice of the disabled was silenced in local debates as they were not allowed to move into the neighborhood in the first instance.[44]  The values of political accountability and experimentation, in fact, may be strengthened by the reasonable accommodations provision allowing the disabled an equal opportunity to live and participate in our communities, and thus change society through the local democratic process.

To be clear, nothing in this analysis supports the argument that the federal government can regulate the intricacies of local zoning decisions.  In fact, the vast majority of local zoning decisions support the rationale of federalism, providing political accountability and flexibility through local control.  Neither the reasonable accommodations provision nor the FHAA purports to change this balance of power.[45]  See Bryant Woods Inn Inc. v. Howard County Md., 124 F.3d 597, 603 (4th Cir. 1997) ("In

---

[44]    Testimony regarding the problem of discriminatory zoning rules targeting group homes, and therefore their exclusion from the community, was heard in congressional hearings in 1979, 1986, and 1987. See supra note 38.

[45]    Of course, there is also nothing that allows local officials to avoid federal or constitutional requirements.  There is ample history of local land use being regulated when the proper constitutional authorities require it.  See, e.g., City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 434 (1985) (invalidating municipal zoning ordinance that discriminated against mentally retarded citizens); Moore v. City of East Cleveland, 431 U.S. 494, 499 (1977) (invalidating local housing ordinance that limited occupancy of a dwelling to a circumscribed definition of family).

enacting the FHA, Congress clearly did not contemplate abandoning the deference that courts have traditionally shown to such local zoning codes."); see also Oxford House-C v. City of St. Louis, 77 F.3d 249, 253 (8th Cir. 1996) ("Congress also did not intend the federal courts to act as zoning boards.").

While federal courts are ill-equipped to act as zoning boards, we have, however, proved competent in enforcing anti-discrimination provisions enacted pursuant to the proper constitutional authority.[46] The challenged reasonable accommodations provision simply prohibits discrimination in housing against the disabled by providing equal access to housing options. Because housing discrimination against certain members of society is shown to affect interstate commerce, and that discrimination is directly the result of local bias, it is well within Congress's power to provide measures such as the reasonable accommodations provision to prohibit that discrimination.

We end our discussion of § 3604(f)(3)(B) where Morrison began its analysis: "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." 120 S. Ct. at 1748.

---

[46] See e.g., Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1103-05 (3d Cir. 1996); Oxford House-C v. City of St. Louis, 77 F.3d 249, 251 (8th Cir. 1996); Seniors Civil Liberties Ass'n, 965 F.2d at 1036.

53

Following Morrison, we hold that Congress did not exceed its bounds in determining that the decision to grant or deny reasonable accommodations to a disabled buyer or renter of real property was an activity "economic in nature," and that Congress can well prohibit discrimination in the national market for housing. See id. at 1751. We are supported in our conclusion that Congress had a rational basis for its regulation by the lengthy legislative record of the FHAA, and the direct effect the anti-discriminatory regulation has on interstate commerce.

For the foregoing reasons, we hold that § 3604(f)(3)(B) was enacted pursuant to Congress's legitimate authority under the Commerce Clause and affirm the district court's grant of an injunction against the Parish of Jefferson.

## D. The Reasonable Accommodations Provision Is Not Unconstitutionally Vague

The Parish argues that even if we find § 3604(f)(3)(B) to be a valid exercise of Congress's commerce power, the reasonable accommodations provision is unconstitutionally vague. We disagree.

"A statute is unconstitutionally vague if it does not give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" United States v. Bird, 124 F.3d 667, 683 (5th Cir. 1997) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). The void-for-vagueness doctrine has been

54

primarily employed to strike down criminal laws.  See Okpalobi v. Foster, 190 F.3d 337, 358 n.10 (5th Cir. 1999).  In the civil context, "the statute must be 'so vague and indefinite as really to be no rule at all.'"  Seniors Civil Liberties Ass'n v. Kemp, 965 F.2d 1030, 1036 (11th Cir. 1992) (quoting Boutilier v. INS, 387 U.S. 118, 123 (1967)).

Applying this standard, we find no merit in the Parish's contention that the provision is vague.  In the first instance, the reasonable accommodations terminology had a workable meaning even before Congress adopted it in the FHAA.  The legislative history of the FHAA demonstrates that Congress chose the reasonable accommodations language because "the concept of reasonable accommodations has a long history in regulations and case law dealing with discrimination on the basis of handicap." H.R. REP. NO. 100-711, at 25 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2186 (citing Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 410-12 (1979)).

This long history of interpretation has continued to the present day as many of our sister circuits have interpreted the reasonable accommodations provision without constitutional difficulty.  See, e.g., Bryant Woods Inn, Inc. v. Howard County, Md. 124 F.3d 597, 602 (4th Cir. 1997); Smith & Lee Assocs., Inc. v. City of Taylor, Mich., 102 F.3d 781, 794-96 (6th Cir. 1996); Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1103-05 (3d Cir. 1996); Oxford House-C v. City of St. Louis, 77 F.3d 249, 251

55

(8th Cir. 1996); <u>Seniors Civil Liberties Ass'n</u>, 965 F.2d at 1036. These cases, and the numerous district court decisions interpreting the reasonable accommodations language, undermine the Parish's contention that the provision is unclear or unworkable and certainly vitiates the argument that the provision is equivalent "to being no rule at all". <u>Seniors Civil Liberties Ass'n</u>, 965 F.2d at 1036. We conclude that the reasonable accommodations language is neither vague nor indefinite, and therefore reject the Parish's void-for-vagueness challenge.

## V. CONCLUSION

For the above reasons, we AFFIRM the judgment of the district court.