**UNITED STATES of America,
Plaintiff,**

v.

**Julio Adrian MARTINEZ, Defendant.**

**Cause No. 3:08–CR–3354–KC.**

United States District Court,
W.D. Texas,
El Paso Division.

Feb. 27, 2009.

---

J. Brandy Gardes, Assistant U.S. Attorney, El Paso, TX, for Plaintiff.

Tyrone Thelonious Mansfield, Federal Public Defender's Office, El Paso, TX, for Defendant.

## ORDER

KATHLEEN CARDONE, District Judge.

On this day, the Court considered "Defendant's Motions for Dismissal and for Bill of Particulars" ("Defendant's Motion")

(Doc. No. 23) and "Government's Response to Defendant's Motion to Dismiss Indictment and for Bill of Particulars" ("Government's Response") (Doc. No. 26). For the reasons set forth herein, Defendant's Motion is **DENIED.**

## I. BACKGROUND

The following facts are alleged in the Probable Cause Statement appended to the Criminal Complaint. (Doc. No. 1). On September 23, 2008, deputies from the El Paso County Sheriff's Office ("EPCSO") responded to a kidnapping complaint in Vinton, Texas, in the Western District of Texas. When the deputies arrived at the scene, they interviewed Maria Villalobos ("Villalobos"), who stated that her minor cousin ("JC"), had been staying with her while JC's mother was at work.[1] Just after 6 p.m. on that day, a vehicle arrived at Villalobos's residence. Villalobos told JC to see who it was. A few minutes later, Villalobos looked out the window and saw Defendant forcing JC into a brown Kia Sephia. Villalobos stated that it seemed to her that JC was attempting to get away, but Defendant pushed JC into the vehicle with his body. Once JC was in the car, the vehicle drove off.

EPCSO deputies also interviewed Lucy Guillen ("Guillen"), JC's mother. Guillen stated that on September 23, 2008, she had taken her other daughter to the hospital emergency room and had left JC with Villalobos. Just after 7 p.m., when Guillen arrived at Villalobos's house to pick up JC,

Villalobos informed Guillen that Defendant had taken JC. Guillen stated that JC had been dating Defendant for three months. Guillen also stated that she feared for her life and her family's lives because of everything that had happened. Guillen filed kidnapping charges on behalf of JC.

On September 24, 2008, EPCSO issued an AMBER Alert[2] for suspected kidnap victim JC and Defendant in a brown Kia Sephia.[3] Later that same day, JC was recovered while crossing from Juarez, Mexico, to the United States.

In a subsequent interview, JC stated that she was eating outside the Villalobos residence on September 23, when she saw Defendant pull up in the brown Kia Sephia and park in front of the residence. Defendant then got out of the car, grabbed her by her arm and pushed her into the vehicle. JC stated she tried to fight back, but Defendant hugged her from behind and forced her into the backseat of the car, tearing her shirt in the process. Defendant then jumped in after JC and told the driver to go.

As the car drove off, Defendant asked JC why she did not want to be with him. She stated that he was just a friend, and Defendant got angry. The car then dropped her and Defendant off in the downtown area, where they were picked up by another driver in a different vehicle. They then drove around in the area of Defendant's aunt's house, but never

---

1. JC was fifteen years old at the time of the Complaint.

2. The term "AMBER" means "America's Missing: Broadcast Emergency Response." An AMBER Alert is

 a voluntary partnership between law-enforcement agencies, broadcasters, transportation agencies, and the wireless industry, to activate an urgent bulletin in the most serious child-abduction cases. The goal of

an AMBER Alert is to instantly galvanize the entire community to assist in the search for and the safe recovery of the child.

*See* U.S. Department of Justice: Office of Justice Programs, AMBER Alert: America's Missing Broadcast Emergency Response, *available at http://www.amberalert.gov/* (last visited Feb. 18, 2009).

3. Defendant is 20 years old.

stopped because Defendant thought he saw police in the area.

After an hour, JC and Defendant were dropped off near a bridge from El Paso, Texas to Juarez, Mexico. Defendant then grabbed JC's arm and led her across the bridge into Juarez. Once in Juarez, Defendant took JC in a taxi cab to a house that Defendant was able to unlock with a key. Defendant told JC that the house belonged to his aunt and that she was not home. Once inside, JC laid down on the couch and Defendant sat down beside her. Defendant started to touch JC's leg, but she told him to get away. Initially, Defendant stopped, but after a few minutes he came back and got on top of JC. Defendant pulled JC's pants down while he held JC hands above her head. Defendant then raped JC. JC struggled to push Defendant off and repeatedly told Defendant to get off of her. JC continued to struggle and Defendant stopped a few minutes later.

The next day, September 24, 2008, at approximately 9 a.m., JC and Defendant were watching television and saw the AMBER Alert that had been issued for JC. JC suggested that Defendant let her go, but Defendant said that things could not get any worse. Defendant also stated that he believed that no one could find them in Juarez. Later that morning, Defendant received a telephone call regarding a work opportunity. Defendant told JC that he would be back in half an hour and that JC should not do anything stupid. Defendant then locked the door and left.

Once Defendant had left, JC found an open window and climbed out of the house. JC then made her way towards the border by following road signs. When she arrived at the border, JC begged for the money needed to pay the toll and cross over the bridge. Once JC had received enough money, she crossed back into the United States and informed Customs and Border Protection that she was the female in the AMBER Alert.

On October 8, 2008, a bench warrant was issued for Defendant, pursuant to a Criminal Complaint filed on that same day. (Docs. No. 1, 4). The Criminal Complaint charged Defendant with knowingly transporting a minor in foreign commerce with the intent to engage in illicit sexual conduct, in violation of Title 18, United States Code § 2423(a). Compl. 1. On November 25, 2008, Defendant was arrested and held without bond.

On December 10, 2009, a Grand Jury sitting in the Western District of Texas returned a seven-count Indictment against Defendant, charging Defendant with:

**Count 1:** Transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a).

**Count 2:** Travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C § 2423(b).

**Count 3:** Engaging in illicit sexual conduct in foreign places, in violation of 18 U.S.C. § 2423(c).

**Count 4:** Coercion and enticement, in violation of 18 U.S.C. § 2422(a)

**Count 5:** Coercion and enticement, in violation of 18 U.S.C. § 2422(c)

**Count 6:** Transportation, in violation of 18 U.S.C. § 2421.

**Count 7:** Kidnapping, in violation of 18 U.S.C. § 1201(a).

Indictment 1–4.

On January 14, 2009, Defendant filed the instant Motion. In his Motion, Defendant argues that the charges in the Indictment are multiplicitous, and that the Government should be compelled to elect the Counts it chooses to prosecute and to dismiss the others. Def.'s Mot. 2–6. Defendant also argues that the Court lacks

jurisdiction over Defendant's underlying alleged illicit sex acts in Counts 1, 2, and 3, because such actions took place in Mexico, and applying the laws in these Counts to Defendant violates principles of international law. *Id.* at 8–16. Defendant also argues that Count 3 must be dismissed because 18 U.S.C. § 2423(c) violates the Commerce Clause of the United States Constitution. *Id.* at 16–18. Defendant also requests the Court to order the Government to produce the minutes of the Grand Jury proceedings and to file a bill of particulars. *Id.* at 7–8; 18–22.

On January 27, 2009, the Government filed its Response to Defendant's Motion.

## II. STANDARD

Federal Rule of Criminal Procedure 12(b)(2) states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R.CRIM.P. 12(b)(2); *United States v. Lankford,* 196 F.3d 563, 569 (5th Cir.1999). A party must raise before trial "a motion [that] alleged a defect in the indictment or information—but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense[.]" FED.R.CRIM.P. 12(b)(3).

 When challenging the constitutionality of a statute, a defendant may challenge the statute either on its face, or as the statute is applied to a defendant's particular circumstances. *See United States v. Luna,* 165 F.3d 316, 319–22 (5th Cir.1999) (analyzing the constitutionality of 18 U.S.C. § 922 both facially and as applied); *United States v. Robinson,* 119 F.3d 1205, 1213–15 (5th Cir.1997) (holding the Hobbs Act to be constitutional both facially and as applied to the defendant). Outside of the First Amendment context, a plaintiff may only succeed in a facial challenge to the constitutionality of a statute by "establishing that no set of circumstances exists under which the Act would be valid."[4] *Washington State Grange v.*

---

4. *See also United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish *that no set of circumstances exists* under which the Act would be valid.") (emphasis added). This Court notes, however, that there is an ongoing disagreement among the justices of the United States Supreme Court regarding the validity of the *Salerno* standard to determine the facial validity of a legislative act. *See Washington State Grange v. Washington State Republican Party,* —— U.S. ——, 128 S.Ct. 1184, 1190 & n. 6, 170 L.Ed.2d 151 (2008) (citing *Washington v. Glucksberg,* 521 U.S. 702, 739–40 & n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). In fact, several of the justices have called into question the validity of this portion of the *Salerno* opinion. *Glucksberg,* 521 U.S. at 739–740, & n. 7, 117 S.Ct. 2258 (Stevens, J., concurring in judgments) (citing inter alia Michael C. Dorf, *Facial Challenges to State and Federal Statutes,* 46 STAN. L.REV. 235, 239–240 (1994)).

The uncertainty surrounding the authority of the *Salerno* holding is significant. *Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (Stevens, J., Souter, J., and Ginsburg, J.) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court....").

Most recently, in *Washington State Grange,* Justice Thomas, writing for the majority, recognized this criticism of *Salerno. Washington State Grange,* 128 S.Ct. at 1190 & n. 6. The Court in *Washington State Grange* applied both the *Salerno* standard as well as the more deferential "plainly legitimate sweep" standard and held that the statute in question survived the facial challenge under either standard. *Id.* at 1190. Nevertheless, though there may be uncertainty surrounding the authority of the *Salerno* holding as the proper analysis for considering facial challenges to the constitutionality of a statute, the Fifth

*Washington State Republican Party,* —— U.S. ——, 128 S.Ct. 1184, 1190 & n. 6, 170 L.Ed.2d 151 (2008) (citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); *Center for Individual Freedom v. Carmouche,* 449 F.3d 655, 662 (5th Cir.2006).

## III. DISCUSSION

### A. Multiplicity of Counts

Defendant first argues that a number of the Counts in the Indictment are multiplicitous. Def.'s Mot. 2. Specifically, Defendant argues that several of the Counts, though charged under different statutes or statutory subsections, require proof of the same facts, and therefore expose Defendant to multiple punishments for the same act. *Id.* Defendant argues that Counts one and six are multiplicitous, and Counts four, five and seven are multiplicitous. *Id.* at 3–7. Defendant argues that the Government should be compelled to elect the Counts it chooses to prosecute and to dismiss all other Counts. *Id.* at 2.

■■■■■ "The rule against multiplicitous prosecutions stems from the Fifth Amendment's proscription against double jeopardy." *United States v. Planck,* 493 F.3d 501, 503 (5th Cir.2007) (citing *United States v. Kimbrough,* 69 F.3d 723, 729 (5th Cir.1995)). "The rule prevents the Government from charging a single offense in more than one count of an indictment." *Id.* (citing *United States v. Heath,* 970 F.2d 1397, 1401 (5th Cir.1992)). The rule "is intended to prevent multiple punishments for the same act." *Kimbrough,* 69 F.3d at 729 (citing, inter alia, *United States v. Brechtel,* 997 F.2d 1108, 1112 (5th

Cir.), *cert. denied,* 510 U.S. 1013, 114 S.Ct. 605, 126 L.Ed.2d 570 (1993)).

■■■■■ While multiplicity often involves charging a defendant with multiple counts under the same statute, multiplicity may also arise when a defendant is charged with violating different statutes, but "Congress intended the same conduct to be punishable under two criminal provisions." *Kimbrough,* 69 F.3d at 730 n. 5 (citing *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)). In *Blockburger,* the Supreme Court held that "where the same act or transaction constitutes a violation of distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180 (citation omitted); *see also United States v. Ogba,* 526 F.3d 214, 233 (5th Cir.2008); *United States v. Buchanan,* 485 F.3d 274, 278 (5th Cir.2007). In applying this test, a court must not examine the particular facts of the case or the circumstances involved, but rather must compare the statutory elements of each offense argued to be multiplicitous. *See Lankford,* 196 F.3d at 577–78 (citing *United States v. Soape,* 169 F.3d 257, 266 (5th Cir.1999); *United States v. Singleton,* 16 F.3d 1419, 1422 (5th Cir. 1994)). The appropriate remedy for allowing a jury to return convictions on multiplicitous counts is to order the government to "dismiss[ ] the counts that create the multiplicity." *United States v. Saks,* 964 F.2d 1514, 1526 (5th Cir.1992) (quoting *United States v. Moody,* 923 F.2d 341, 347–48 (5th Cir.1991)).

Circuit has clearly stated that the "no set of circumstances" standard applies to facial challenges outside of the First Amendment context. *Center for Individual Freedom v. Carmouche,* 449 F.3d 655, 662 (5th Cir.2006)

(citing *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095). Because this Court must follow Fifth Circuit precedent, the Court will apply the *Salerno* no-set-of-circumstances standard to the instant case.

However, "[w]hile the Double Jeopardy Clause may protect a single defendant against cumulative *punishments* for convictions on the same offense, the Clause does not prohibit the State from *prosecuting* [a defendant] for such multiple offenses in a single prosecution." *Ohio v. Johnson*, 467 U.S. 493, 500, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984) (emphasis added). Indeed, "a draftsman of an indictment may charge crime in a variety of forms to avoid fatal variance of the evidence. He may cast the indictment in several counts where the body of facts upon which the indictment gives rise to only one criminal offense or to more than one." *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 225, 73 S.Ct. 227, 97 L.Ed. 260 (1952). The Supreme Court "has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." *Ball v. United States*, 470 U.S. 856, 859, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985). Accordingly, the Government may prosecute a defendant under separate statutes even when conviction and punishment under multiple statutes may not be appropriate. *Id.*; *see also United States v. Thomas*, 810 F.2d 478, 479 (5th Cir.1987).

Nevertheless, the Fifth Circuit has identified two dangers arising from a multiplicitous indictment. *United States v. Smith*, 591 F.2d 1105, 1108 (5th Cir.1979). First, "[t]he chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Planck*, 493 F.3d at 503 (quoting *United States v. Swaim*, 757 F.2d 1530, 1537 (5th Cir. 1985)). However, this danger is only inchoate at the time of charging and does not become full-fledged until after sentencing on purportedly multiplicitous counts. Accordingly, an indictment charging multi-plicitous counts does not require dismissal, and any compelled election of counts before sentencing is in a court's discretion. *Smith*, 591 F.2d at 1108.

In deciding how to exercise its discretion, the Court notes that an additional danger may arise from a multiplicitous indictment: "namely an adverse psychological effect on the jury may result from the suggestion that several crimes have been committed." *Smith*, 591 F.2d at 1108 (citing *United States v. Hearod*, 499 F.2d 1003 (5th Cir.1974)); *see also United States v. Alexander*, No. 06–60074–01, 2008 WL 4790125, at *2 (W.D.La. Oct. 31, 2008). Therefore, an election of counts may be ordered if the Defendant can show prejudice from being charged with multiplicitous counts. *Cf. United States v. Pacheco*, 489 F.2d 554, 560 (5th Cir.1974) (allowing for an election of counts under Rule 14 of the Federal Rules of Criminal Procedure when "prejudice would result from a joinder of offenses or of defendants for trial."). However, "the burden of demonstrating prejudice is a difficult one, and the ruling of a trial judge will rarely be disturbed upon review." *Id.* Defendant has made no attempt at demonstrating prejudice from being charged with multiplicitous counts. Accordingly, no prejudice from the Counts will be inferred.

The Court therefore need not reach the issue of whether the Counts charged against Defendant are multiplicitous. Any such argument is premature and will only be addressed once these matters have been brought to trial.

## B. Request for the Minutes of the Grand Jury Proceedings

Included in Defendant's multiplicity argument is a request for the grand jury minutes regarding certain counts in his Indictment. Def.'s Mot. 7–8. Specifically, Defendant argues that "[i]f the Gov-

ernment elects to pursue ... distinct legal theories [in Counts Four, Five, and Six], it is requested that it be ordered to produce the grand jury minutes and validate the grand jury proceedings in this case, as well as to insure Governmental compliance with grand jury referral obligations." Def.'s Mot. 8.

■ "Federal courts long have recognized that secrecy is essential to maintaining the integrity of the grand jury system." *In re Grand Jury Testimony,* 832 F.2d 60, 62–63 (5th Cir.1987) (citing *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *United States v. Procter & Gamble,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)). However, such secrecy "is not an absolute," *id.,* and Federal Rule of Criminal Procedure 6 states, in relevant part, that "[t]he Court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand jury matter: ... (ii) at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" Fed. R.Crim.P. 6(e)(3)(E). Moreover, "case law has established that a district court may properly order release of grand jury materials where a party demonstrates with particularity a 'compelling necessity' for the materials." *Izen v. Catalina,* 256 F.3d 324, 329–30 (5th Cir.2001) (quoting *In re Grand Jury Testimony,* 832 F.2d at 62–63 (quoting *Procter & Gamble,* 356 U.S. at 682, 78 S.Ct. 983)). Disclosure of grand jury minutes falls to the court's discretion. *Id.* at 329.

■ To demonstrate "compelling necessity" for grand jury materials under Rule 6(e), a party must show (1) that the material they seek is needed to avoid a possible injustice in another judicial proceeding, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that their request is structured to cover only material so needed. *In re Grand Jury Testimony,* 832 F.2d at 62 (citing *Douglas Oil Co.,* 441 U.S. at 222, 99 S.Ct. 1667).

Defendant's argument for access to grand jury proceedings arises out of his argument that the Counts in his Indictment are multiplicitous. The Court has held that any argument of multiplicity is premature and that the Defendant has failed to show any irregularity in the manner in which the Government has drafted his Indictment. Moreover, Defendant has failed to show a need pursuant to the factors outlined in *In re Grand Jury Testimony* or an otherwise "compelling necessity" for the requested materials. *See id.* Accordingly, Defendant's request for grand jury materials is denied.

## C. Lack of Jurisdiction Based on International Law Principles

Defendant next argues that this Court lacks subject-matter jurisdiction over the offenses alleged in Counts One, Two, and Three, because the underlying illicit sexual activity took place in Mexico. Def.'s Mot. 8–9. Specifically, Defendant argues that the statutes which Defendant is charged with violating—18 U.S.C. §§ 2423(a)-(c)—cannot be applied extraterritorially, because to do so would violate Congressional intent, principles of international law, and would otherwise be unreasonable under international law. *Id.* at 9–16. Accordingly, Defendant argues that Counts One, Two and Three should be dismissed as a matter of law. *Id.* at 16.

Defendant is charged in Count One of the Indictment with violating 18 U.S.C. § 2423(a). Defendant is charged in Count Two with violating § 2423(b). Defendant is charged in Count Three with violating

§ 2423(c). 18 U.S.C. § 2423 states, in relevant part:

**(a) Transportation with intent to engage in criminal sexual activity.**—A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title and imprisoned not less than 10 years or for life.

**(b) Travel with intent to engage in illicit sexual conduct.**—A person who travels in interstate commerce or travels into the United States, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, for the purpose of engaging in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

**(c) Engaging in illicit sexual conduct in foreign places.**—Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(a)-(c).[5]

 The Court initially notes that the Fifth Circuit has held that the criminal act required for 2423(b) is not the subsequent exploitation of a child but "the foreign travel with an illicit intent." *United States*

*v. Bredimus*, 352 F.3d 200, 210 (5th Cir. 2003) (citing *United States v. Gamache*, 156 F.3d 1, 8 (1st Cir.1998); *United States v. Hersh*, 297 F.3d 1233, 1245–46 (11th Cir.2002)). Accordingly "the prohibited conduct [in § 2423(b)] occurred in the United States[.]" *Id.* Similarly, in the instant case, Defendant is charged in Count Two of the Indictment with travelling from the United States to Mexico with the intent to commit an illicit sexual act. Indictment 2. Accordingly, no discussion of extraterritorial jurisdiction is necessary for this Count.

 The reasoning in *Bredimus* regarding § 2423(b) also appears to apply *a fortiori* to Defendant's charge under § 2423(a), given that Defendant is charged with travelling from the United States to Mexico with a similar criminal intent. *Compare Bredimus*, 352 F.3d at 210 *with* Indictment 1. The criminal act in Count One also took place in the United States, and there is no need to consider the application extra-territorial jurisdiction.

The foregoing analysis therefore applies primarily to Count Three, namely Defendant's alleged violation of § 2423(c), because the criminal act—illicit sexual conduct with a minor—allegedly took place extraterritorially. The Court notes, however, that the analysis can apply similarly to any extraterritorial elements remaining in Counts One and Two.

### 1. Section 2423 and Congressional intent

 "Generally, there is no constitutional bar to the extraterritorial application of the United States penal laws."

**5.** The statute further states that "the term "illicit sexual conduct" means (1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591) with a person under 18 years of age." 18 U.S.C. § 2423(f). Chapter 109A comports with 18 U.S.C. §§ 2241–49.

*United States v. Felix–Gutierrez,* 940 F.2d 1200, 1204 (9th Cir.1991) (citing *Chua Han Mow v. United States,* 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied,* 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *United States v. King,* 552 F.2d 833, 850 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977)). It is further undisputed that "the legislative authority of the United States over its citizens extends to conduct by Americans ... even within the territory of other sovereigns." *United States v. Mitchell,* 553 F.2d 996, 1001 (5th Cir.1977) (citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952); *Foley Bros. v. Filardo,* 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Vermilya–Brown Co. v. Connell,* 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948); *Blackmer v. United States,* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *Cook v. Tait,* 265 U.S. 47, 44 S.Ct. 444, 68 L.Ed. 895 (1924); *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922)). Moreover, "international law principles do not constrain this legislative authority, because citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state." *Id.* (citations omitted). In determining whether Congress intended for a law to apply extra-territorially, the court considers two principles. *Id.* The first is whether the law itself speaks to being applied extraterritorially:

> (Some laws) are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens ... in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the ...

foreign countries, but allows it to be inferred from the nature of the offense. *Id.* (quoting *Bowman,* 260 U.S. at 98, 43 S.Ct. 39); *see also United States v. Baker,* 609 F.2d 134, 136 (5th Cir.1980) ("Absent an express intention on the face of the statutes to do so, the exercise of [extraterritorial jurisdiction] may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved.").

■■■ However, "if the nature of the law does not mandate its territorial application, then a presumption arises against such application." *Mitchell,* 553 F.2d at 1001 (citing *Bowman,* 260 U.S. at 98, 43 S.Ct. 39). "To overcome that presumption and to apply the statute beyond the territory of the United States, the Government must show a clear expression of congressional intent." *Id.* (citations omitted); *see also Boureslan v. Aramco,* 857 F.2d 1014, 1016 (5th Cir.1988) (recognizing a presumption against the extraterritorial application of statutes absent Congressional intent); *Chitimacha Tribe of La. v. Harry L. Laws Co.,* 690 F.2d 1157, 1168 (5th Cir.1982).

■■■ A plain reading of § 2423 demonstrates that it is designed to have extraterritorial application. First, all three operative subsections (under which Defendant is charged) refer to a defendant's travel in "foreign commerce" as a nexus for prohibiting the criminalized behavior. *See* § 18 U.S.C. § 2423(a)-(c). This term alone evinces Congressional intent for the statute to be applied extraterritorially. *See United States v. Montford,* 27 F.3d 137, 139–40 (5th Cir.1994) ("Congress intended foreign commerce to mean travel to and from, or at least some form of contact with, a foreign state."); *United States v. Hill,* 279 F.3d 731, 739 (9th Cir.2002) (inclusion of a "foreign commerce" provision "strongly suggests that Congress intended

to cast a broad net and apply the statute to all offenders, whether or not they are found in the United States."). While a strained reading of the statute may support an argument that the statute only criminalizes illicit sexual behavior when a defendant has travelled from *outside* the country *into* the United States, nothing in the statute indicates it was designed to punish behavior going only one direction. Indeed, such a reading would "greatly ... curtail the scope and usefulness of the statute and leave open a large immunity for [crimes] as easily committed by citizens ... in foreign countries as at home." *Mitchell*, 553 F.2d at 1001 (quoting *Bowman*, 260 U.S. at 98, 43 S.Ct. 39).

Moreover, it may also "be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved" that extraterritorial jurisdiction was part of the legislative scheme. *See Baker*, 609 F.2d at 136. On July 5, 2000, President William Jefferson Clinton signed the Option Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography ("Optional Protocol").[6] Optional Protocol, May 16, 2000, 39 I.L.M. 1285, 2000 WL 33366017. The Senate ratified the Optional Protocol on December 23, 2002, and it entered into force in January of 2003. *See* Optional Protocol (signatories) at 9, *available at http://www.unhcr.org/refworld/pdfid/3ae6b38bc.pdf* (last visited

Feb. 5, 2009).[7] The Optional Protocol states in its preamble that the States Parties to the present Protocol are *"[g]ravely concerned* at the significant and increasing international traffic of children" and that the parties were *"[d]eeply concerned* at the widespread and continuing practice of sex tourism[.]" *Id.* Preamble (emphasis in original). In relevant part, the Optional Protocol calls upon each signatory to criminalize, "as a minimum," the sale and sexual exploitation of a child as it relates to child prostitution "whether these offences are committed domestically or transnationally or on an individual or organized basis[.]" *Id.* art. 3 ¶ 1. The Optional Protocol also calls upon its signatories to "take such measures as may be necessary to establish its jurisdiction over the offences" when the offender is a national of the state in question, and when the victim is a national of the state in question. *Id.* art. 4. ¶ 2. The Optional Protocol also "does not exclude any criminal jurisdiction exercised in accordance with internal law." *Id.* art. 4 ¶ 4.

One of the statutes that Congress enacted to implement the Optional Protocol was § 2423, which was part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Act of 2003 (the "PROTECT Act"). Pub.L. 108–21, 117 Stat. 650 (2003); *see also United States v. Frank*, 486 F.Supp.2d 1353, 1356–60 (S.D.Fla.2007) (discussing Optional Proto-

---

**6.** The Convention on the Rights of the Child, to which the Optional Protocol is appended, defines a "child" as "every human being below the age of eighteen years unless under the law applicable to the child, majority is attained earlier." *See* Convention on the Rights of the Child, G.A. Res. 44/25 (Sep. 2, 1990), *available at http://www.unhchr.ch/html/menu 3/b/k2crc.htm* (last visited Feb. 6, 2009). The United States is a signatory to the Convention, and Mexico has both signed and ratified the Convention. *See* Status of Ratifications of the Principal International Human Rights

Treaties 7, 12, *available at http://www.unhchr. ch/pdf/report.pdf* (last visited Feb. 6, 2009).

The Mexican federal Civil Code also denotes that "majority begins at 18 years of age." Codigo Civil Federal (Federal Civil Code) C.C.F. § 13.04 (Mexico), as stated in 1–1 MEXICO LAW DIGEST 13.04.

**7.** Mexico also signed the Optional Protocol on Sep. 7, 2000, and ratified it on Mar. 15, 2002. *See id.*

col, the PROTECT Act, and the extraterritorial effect of § 2423(c)). As part of the House Conference Report accompanying the PROTECT Act, the House stated that its proposed modification to § 2423 "addresses a number of problems related to persons *who travel to foreign countries* and engage in illicit sexual relations with minors." H.R. Conf. Rep. 108–66, 108th Cong. 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686 (emphasis added). Given that § 2423 was passed to enforce a multilateral treaty designed to protect children from *transnational and domestic* child sex prostitution and "sex tourism," and given that the House Conference Report specifically mentions the statute's application to persons travelling in foreign countries, the Court concludes that Congress intended § 2423 to apply extraterritorially. *See also United States v. Strevell,* 185 Fed.Appx. 841, 844–45 (11th Cir. 2006) (unpublished) (holding that § 2423(c) was designed to apply extraterritorially).

## 2. Section 2423 and general principles of international law

■ Defendant also argues that an extraterritorial application of § 2423 violates principles of international law. The Court notes initially that "international law," *qua* law, is not a fixed set of legal mandates or legally cognizable statutes with independent authority in United States courts. Indeed, there is no authority in *international* law that United States *national* courts must recognize, except insomuch as Congress or the President incorporates some part of it through constitutional channels into national law. *See, e.g., Medellin v. Texas,* —— U.S. ——, 128 S.Ct. 1346, 1357, 170 L.Ed.2d 190 (2008) (neither decisions of the International Court of Justice nor non-self-executing treaties create domestically enforceable law); *Hamdan v. Rumsfeld,* 548 U.S. 557, 610, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006)

(applying protections recognized by customary international law only as they have been adopted and incorporated into federal law), *superseded by statute on other grounds as stated in Boumediene v. Bush,* —— U.S. ——, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); *see also United States v. Davis,* 905 F.2d 245, 248 (9th Cir.1990) ("International law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts."). Moreover, "[i]n enacting statutes, Congress is not bound by international law.... If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of limits posed by international law." *United States v. Pinto–Mejia,* 720 F.2d 248, 259 (2d Cir.1983); *see also Rainey v. United States,* 232 U.S. 310, 316, 34 S.Ct. 429, 58 L.Ed. 617 (1914). Nevertheless, when "determining whether a statute applies extraterritorially, [courts] presume that Congress did not intend to violate principles of international law." *United States v. Vasquez–Velasco,* 15 F.3d 833, 839 (9th Cir. 1994) (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)); *see also Murray v. Schooner Charming Betsy,* 6 U.S. 64, 2 Cranch 64, 2 L.Ed. 208 (1804) ("[A]n Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains...."); *United States v. Thomas,* 893 F.2d 1066, 1069 (9th Cir.1990) ("Although Congress is not bound by international law in enacting statutes, out of respect for other nations, courts should not unnecessarily construe a congressional statute in a way that violates international law.") (citations omitted). Therefore, the Court will next look to see if an extraterritorial application of § 2423 violates certain principles of international law.

International law recognizes several principles under which a statute may be applied extraterritorially. These include the "territorial" principle, where jurisdiction is based on the place where the offense is committed; the "national" principle, where jurisdiction is based on the nationality or national character of the offender; the "protective" principle, where jurisdiction is based on whether the national interest is affected; the "universality" principle, where jurisdiction is based on the physical custody of the offender; and the "passive personality" principle, where jurisdiction is based on the nationality or national character of the victim. *See Rivard v. United States,* 375 F.2d 882, 885–86 (5th Cir.1967); *United States v. Roberts,* 1 F.Supp.2d 601, 607 (E.D.La. 1998).

Upon review, § 2423 withstands scrutiny under several principles of international law. First, Defendant is charged as a United States citizen. *See* Personal Data Sheet (Doc. No. 12). As stated previously, citizenship alone grants Congress the right to enact laws with extraterritorial application, thus authorizing jurisdiction under the "national" principle. *See Mitchell,* 553 F.2d at 1001; *see also Rivard,* 375 F.2d at 886; *Hill,* 279 F.3d at 740; *Thomas,* 893 F.2d at 1069; *United States v. Clark,* 315 F.Supp.2d 1127, 1131 (W.D.Wa.2004), *aff'd,* 435 F.3d 1100 (2006). In addition, the Government asserts that the victim in the instant case—JC—is also an American citizen. Gov't's Resp. 17–18. Jurisdiction may also therefore be appropriate under the "passive personality" principle. *See United States v. Yousef,* 327 F.3d 56, 96–97 (2d Cir.2003) (finding jurisdiction was consistent with the passive personality principle when the crime involved a plot to bomb United States-flag aircraft that would have carried United States citizens); *United States v. Neil,* 312 F.3d 419, 422–23 (9th Cir.2002) (passive personality principle applied when defendant sexually molested American girl in Mexican waters); *Hill,* 279 F.3d at 740 (failure to make child support payments to American citizens satisfies passive personality principle). Finally, Defendant is charged with travelling in foreign commerce from the United States to Mexico. *See* Indictment 1–2. The alleged facts also state that once the victim had escaped from Defendant's control, she made her way back into the United States, where authorities were engaged in a manhunt for both Defendant and JC, and an AMBER Alert was in effect. These facts are sufficient to support jurisdiction under the "territorial" principle. *See Neil,* 312 F.3d at 422 (sexual molestation of an American victim prompting FBI investigation, followed by arrest of defendant in the United States enough to satisfy territorial principle); *Hill,* 279 F.3d at 739–40. Given that extraterritorial jurisdiction is plainly appropriate under the national, passive personality, and territorial principles of international law, the Court need make no holding with regard to whether § 2423 is appropriate under any other international law principles found in *Rivard.*

### 3. Section 2423 and the "unreasonableness" standard

It has also been held that the extraterritorial application of jurisdiction must not be "unreasonable" under international law. *See, e.g., Boureslan,* 857 F.2d at 1024 (King, J., dissenting); *Vasquez–Velasco,* 15 F.3d at 840; *Clark,* 315 F.Supp.2d at 1132. These opinions that hold to an "unreasonableness" standard each cite the Restatement (Third) of Foreign Relations Law § 403, which sets forth a list of factors in determining the reasonableness of applying a law extraterritorial-

ly.[8]

Unlike the other principles of international law cited above, there is no Fifth Circuit precedent making these factors a mandatory part of the threshold inquiry to determine whether a statute may be applied extraterritorially.[9] The Court declines to do so here. Assuming, however, that the "unreasonableness" standard outlined in the Restatement bears on whether § 2423 may have extraterritorial jurisdiction, an evaluation of the statute reveals no conflict with an "unreasonableness" determination, given the almost universal condemnation of illicit sex with minors in the international community (including Mexico),[10] the fact that both the victim and Defendant in the instant case are alleged to be United States citizens, and the direct link that the charged crimes have with United States territory. *See Clark*, 435 F.3d at 1106. (holding application of § 2423(c) extraterritorially was not "unreasonable" pursuant to international law principles).

Defendant nevertheless argues that applying § 2423 is unreasonable because Defendant was travelling to Mexico to engage in sex, and "the age of consent in Mexico is established by law as 12 years of age depending [sic] the laws of the individual state." Def.'s Mot. 15. The Court fails to see how the target country's law is relevant in the foregoing analysis, given the nationality of the parties and the fact that the statute specifically applies federal law to determining the legality of the predicate sexual conduct. *See* 18 U.S.C. § 2423(f). Moreover, the Court notes that the "illicit

---

**8.** These factors are:

(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted.

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 403(2).

**9.** Judge King notes in her dissent in *Boureslan* that "[n]o court has applied the reasonableness test as part of the threshold inquiry to determine whether a statute may, as a general matter, be applied extraterritorially. The Restatement, however, notes that the reasonableness test may serve the same purpose as the traditional tests for deciding whether a statute may be applied extraterritorially." *Boureslan*, 857 F.2d at 1025 (King, J., dissenting) (citations omitted). Since Judge King's dissent, the Fifth Circuit has made no mention of the Restatement factors in any published or unpublished opinion.

**10.** *See* Convention art. 34 ("States Parties [shall] undertake to protect the child from all forms of sexual exploitation and abuse...."); Optional Protocol Arts. 1–3 (calling for the criminalization of child prostitution and exploitation); Second World Congress against Commercial Sexual Exploitation of Children, The Yokohama Global Commitment 2001 ("We reaffirm, as our primary considerations, the protection and promotion of the interest and rights of the child to be protected from all forms of sexual exploitation ...."), *available at* *http://www.unicef.org/events/yokohama/ outcome.html* (last visited Feb. 6, 2009).

sexual conduct" alleged in this case is not consensual sex with an underage child, as Defendant implies in his Motion, but forced sex with a child, which is specifically prohibited in chapter 109A of the United States Criminal Code, and is thus incorporated into § 2423. *See* 18 U.S.C. § 2423(f) (incorporating § 2241(a) (Aggravated Sexual Abuse by Force or Threat)). This crime is also illegal in Mexico, both under Mexican federal law, and the laws of the state of Chihuahua. *See* Codigo Civil Federal (Federal Civil Code) C.C.F. Titulo 15, Capitulo 1, art. 262 (prohibiting forced sex with a minor); Codigo Penal del Estado de Chihuahua (Chihuahua State Code), Titulo 5, Capitulo 1 ("Violacion"), arts. 171–175. Defendant has therefore failed to demonstrate any likelihood of conflict with Mexico that would exist if the United States regulates this activity.

Accordingly, this Court holds that pursuant to the Indictment and the alleged facts of the instant case, the extraterritorial application of § 2423 does not violate the plain language of § 2423, Congressional intent, or general principles of international law.

### D. 18 U.S.C. § 2423(c) and the Commerce Clause

■ Defendant's final substantive argument is that § 2423(c) is unconstitutional because it violates the Commerce Clause. Def.'s Mot. 16–18. Specifically Defendant argues that "[i]in punishing an action that may be entirely legal in the host country and at best loosely connected to a channel of commerce, section 2423(c) reflects an unprecedented use of Commerce Clause authority." *Id.* at 18.

■ The Constitution grants Congress the authority to "regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The Constitution also grants Congress the authority to "make all laws which shall be necessary and proper for carrying into execution the foregoing power[.]" *Id.* art I., § 8, cl. 18. When reviewing an act of Congress passed under the Commerce Clause, we review the statute under the rational basis standard. *Bredimus*, 352 F.3d at 203 (citing *Groome Resources, Ltd. v. Parish of Jefferson*, 234 F.3d 192, 203 (5th Cir.2000)). In applying this deferential standard, "due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a *plain showing* that Congress has exceeded its constitutional bounds." *Bredimus*, 352 F.3d at 203 (quoting *Groome*, 234 F.3d at 216) (emphasis in quoted text).

Courts have generally recognized three distinct sets of authority under the Commerce Clause, depending on whether Congress seeks to regulate interstate commerce, foreign commerce, or commerce with Indian tribes. *See Clark*, 435 F.3d at 1112–1113 (reviewing Congress's authority under each provision, and the extent of that authority). For much of the 20th century, "the scales of the federal courts' [interstate] Commerce Clause jurisprudence tipped more towards according to Congress considerably greater latitude in regulating conduct rather than to maintaining a distinction between 'what is truly national and what is truly local.'" *Bredimus*, 352 F.3d at 204–05 (quoting *United States v. Morrison*, 529 U.S. 598, 608, 617–18, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *United States v. Lopez*, 514 U.S. 549, 567–68, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)). However, the Supreme Court heralded essentially a "new era" of interstate Commerce Clause jurisprudence with the decisions of *United States v. Lopez,* and *United States v. Morrison,* which "clarified the legal standards applicable to a constitutional challenge under the [inter-

state] Commerce Clause." *Id.* These cases, and their progeny have determined the "outer limits" of Congress's power to enact legislation, and provide the framework for any analysis of interstate Commerce Clause questions. *Id.* (citing *Lopez,* 514 U.S. at 556–567, 115 S.Ct. 1624); *United States v. Ho,* 311 F.3d 589, 596 (5th Cir.2002).

In *Lopez,* the Supreme Court held that a statute making it a federal crime to have a gun within 1,000 feet of a school exceeded the "outer limits" of Congress's authority under the interstate Commerce Clause. *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624 (holding 18 U.S.C. § 922(q)(1)(A) unconstitutional). In holding the gun-control statute unconstitutional, the Court in *Lopez* outlined three broad categories of activity that the Constitution allows Congress to regulate under its interstate commerce power: (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "activities having a substantial relation to interstate commerce, i.e., activities that 'substantially affect' interstate commerce." *Id.* at 558–59, 115 S.Ct. 1624; *see also Bredimus,* 352 F.3d at 206. Subsequent Supreme Court cases have further elaborated on the *Lopez* framework. *See, e.g., Gonzales v. Raich,* 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (applying a rational basis test to whether activities in question substantially affect interstate commerce); *Morrison,* 529 U.S. at 617, 120 S.Ct. 1740 (holding that Congress cannot regulate violent criminal conduct based solely on its aggregate effect on interstate commerce).

The Fifth Circuit has not determined whether § 2423(c) violates Congress's authority under the Commerce Clause. However, the Fifth Circuit recently held in *United States v. Bredimus* that § 2423(b) ("Travel with intent to engage in illicit sexual conduct") did not violate the Commerce Clause. *See Bredimus,* 352 F.3d at 205–06; *see also United States v. Tykarsky,* 446 F.3d 458, 470 (3d Cir.2006); *United States v. Han,* 230 F.3d 560, 562–63 (2d Cir.2000); *Gamache,* 156 F.3d at 8. The court in *Bredimus* held that the language of § 2423(b), and that other laws comparable to § 2423(b), all contain an element of criminal intent that the defendant must have travelling in foreign commerce, thus making the crime one that Congress may regulate. *See Bredimus,* 352 F.3d at 205–07 (comparing § 2423(b) to 18 U.S.C. §§ 1958, 2261, and 2262(a)). The court in *Bredimus* added that because § 2423(b) "only criminalizes foreign travel when the travel is done with an illicit intent, [the statute] does not impermissibly burden the fundamental right to travel." *Id.* at 210.

In contrast to § 2423(b), § 2423(c) has no intent element. An offender may therefore travel in foreign commerce with no intent to commit an illicit sex act, arrive in a foreign locale, commit the act, and still violate § 2423(c). In fact, when Congress passed the PROTECT Act in 2003, the House Conference Report accompanying the Act explained that § 2423(c) was added to the pre-existing law (which is substantively identical to § 2423(b)) so that "the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Rep. No. 108–66 at 51, 2003 U.S.C.C.A.N. at 686. In other words, § 2423(c) was added so that the Government does not have to prove intent. Because the court in *Bredimus* dealt with a statute containing an intent element absent from the statute at issue in the instant case, and because the court in *Bredimus* based its analysis in part on this intent element, the analysis in *Bredimus* is

not dispositive of § 2423(c)'s constitutionality.[11]

Perhaps more on point, the Ninth Circuit more recently held in *United States v. Clark* that "Congress acted within its constitutional bounds in criminalizing commercial sex acts committed by U.S. citizens who travel abroad in foreign commerce" pursuant to 18 U.S.C. § 2423(c). *Clark*, 435 F.3d at 1109. In *Clark*, an American citizen travelled to Cambodia and engaged in sex acts with underage boys, whom he had promised to pay. *Id.* at 1103. The Court in *Clark* held that because the defendant had travelled in foreign commerce and engaged in a *commercial* sex act, "[t]he rational nexus requirement is met to a constitutionally significant degree." *Id.* at 1114–17.

As in *Bredimus*, however, the court in *Clark* based its decision in part on an element conspicuously absent from the instant case. The court in *Clark* specifically analyzed the second prong of "illicit sexual conduct," under § 2423(f), namely "any commercial sex act ... with a person under 18 years of age." *See Clark*, 435 F.3d at 1105 ("it is this second 'commercial sex act' prong that is at issue in Clark's appeal."). Describing child prostitution as a "pernicious 'species of commercial intercourse,'" (*id.*, quoting *Gibbons v. Ogden*, 22 U.S. 1, 193, 9 Wheat. 1, 6 L.Ed. 23 (1824)), the court in *Clark* made its constitutional analysis dependent on the *commercial* element of the definition. *Id.* at 1114–15; *see also id.* at 1110 n. 16 ("We do not decide the constitutionality of § 2423(c) with respect to illicit sexual conduct covered by the non-commercial prong of the statute, such as sex acts accomplished by the use of force or threat.") (citations omitted).

In the instant case, the alleged illicit sex act is non-commercial and likely falls under the first prong of the definition of "illicit sexual conduct" in § 2423(f). Because the court in *Clark* made its conclusion dependent on the commercial nature of the sex act, its decision relies specifically on an element not present in the instant case. Accordingly, *Clark* is not dispositive.[12]

---

**11.** The Court reiterates that the Fifth Circuit in *Bredimus* held that the criminal act in § 2423(b) is not the ultimate sex exploitation "but rather the foreign travel with illicit intent." *Bredimus*, 352 F.3d at 210. The criminal act in § 2423(c), meanwhile, is the illicit sexual act itself, after the defendant travelled in foreign commerce. *See, e.g., United States v. Armstrong*, EP–07–CR–2276–DB, 2007 WL 3171775, at *3–4 (W.D.Tex. Oct. 26, 2007).

**12.** Even more recently, a federal court in the Southern District of Florida held that § 2423(c) was constitutional under the Necessary and Proper Clause in enacting the Optional Protocol. *See Frank*, 486 F.Supp.2d at 1356–59. As in *Clark*, however, the court in *Frank* dealt specifically with the "commercial sex act" prong of § 2423(f) and did not address the constitutionality of the first prong of the "illicit sex act" definition, which is at issue in this case. *See Frank*, 486 F.Supp.2d. at 1358 (defining the issue as "whether, under rational basis review, Congress could enact § 2423(c) under the Necessary and Proper Clause to implement the Optional Protocol and if so, whether the statute—insofar as commercial sex with minors is concerned—reasonably implements the Optional Protocol."). The Court in *Frank* therefore restricted its analysis to commercial sex acts, as the Optional Protocol does not contain specific language addressing the crimes outlined under the first prong of § 2423(f), but deals more specifically with child prostitution, child pornography, and other forms of sexual exploitation of children in regard to child prostitution, all of which fall under the second definition of § 2423(f). *See* Optional Protocol art. 3; *see also United States v. Bianchi*, No. 06–19, 2007 WL 1521123, at *5 (E.D.Pa. May 22, 2007) (holding § 2423(c) constitutional without discussion of whether defendant's sex acts were commercial in nature).

While neither *Bredimus* nor *Clark* deal with the constitutionality of § 2423(c) regarding non-commercial sex acts, both cases provide guidance in how to approach the issue. First, both courts note that the *Lopez/Morrison* framework set forth by the Supreme Court is a relevant starting point to analyzing the foreign commerce clause, and both recognize that some questions of foreign commerce may be answered simply by applying the framework. *See Bredimus*, 352 F.3d at 208 (applying the three-prong *Lopez/Morrison* framework to § 2423(b)); *Clark*, 435 F.3d at 1103 (citing *United States v. Cummings*, 281 F.3d 1046, 1049 n. 1 (9th Cir.2002) (analyzing the constitutionality of the International Parental Kidnapping Act, 18 U.S.C. § 1204(a), under *Lopez*'s three-category approach)). Using this framework, the Fifth Circuit has found § 2423(b) and the Ninth Circuit has found § 2423(c) to be potentially valid regulations of the "channels of commerce." *See Bredimus*, 352 F.3d at 205–07 (comparing § 2423(b) to other statutes regulating the channels of interstate commerce); *Clark*, 435 F.3d at 1116 ("[N]onetheless, there is a good argument that, as found by the district court, § 2423(c) can also be viewed as a valid regulation of the 'channels of commerce.' ").[13]

In addition, both the Fifth Circuit and Ninth Circuit go further in their analysis and hold that when regulating foreign commerce, Congress's authority is not constrained by the three categories in the *Lopez/Morrison* framework. The *Lopez/Morrison* framework "developed in response to the unique federalism concerns that define congressional authority in the interstate context." *Clark*, 435 F.3d at 1103 (citing *Lopez*, 514 U.S. at 557, 115 S.Ct. 1624); *see also Bd. of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 57, 53 S.Ct. 509, 77 L.Ed. 1025 (1933) ("[T]he principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce."). However, there exists in the realm of foreign commerce "the necessity that the nation speak with one voice." *Bredimus*, 352 F.3d at 208 n. 10. Accordingly, any statute that would be granted constitutional deference when it regulates interstate commerce is accorded even greater deference when Congress is regulating foreign commerce. *See Bredimus*, 352 F.3d at 208 ("The Supreme Court has long held that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce.") (citing *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)). "In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce." *Clark*, 435 F.3d at 1113.[14]

13. Because a person may form the intent to commit the criminal act in § 2423(c) after all use of the channels of commerce cease, the Court expresses doubt that § 2423(c) may be constitutionally upheld simply as regulation of the channels of commerce.

14. The Ninth Circuit has gone even further than this Court does today in stating that "Congress's plenary authority over foreign affairs may also provide a sufficient basis for § 2423(c)." *Clark*, 435 F.3d at 1109 n. 14 (citing, e.g., *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 315, 57 S.Ct. 216, 81 L.Ed. 255 (1936) ("The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs."); *United States v. Belmont*, 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ("[C]omplete power over international affairs is in the national government. . . .")).

Finally, for jurisdictional purposes, the court in *Clark* notes that the term "travels in foreign commerce" "unequivocally establishes that Congress specifically invoked the Foreign Commerce Clause." *Id.* at 1114. The term "foreign commerce" is also given a broad definition in Title 18 of the United States Code,[15] and courts have thus given the term an "expansive reach." *Id.* (citing *Montford*, 27 F.3d at 139–40; *Londos v. United States*, 240 F.2d 1, 6 (5th Cir.1957)). In *Clark*, the defendant "got on a plane in the United States and journeyed to Cambodia. This act is sufficient to satisfy the 'travels in foreign commerce' element of § 2423(c)." *Id.* In the instant case, Defendant allegedly climbed in a car and journeyed to Mexico, therefore similarly satisfying the foreign commerce element of § 2423(c).[16]

With these guideposts in mind, the Court turns to the only possible question of constitutional import in the instant case: whether Congress may regulate under the Commerce Clause non-commercial illicit sexual conduct that a defendant engages in after having travelled in foreign commerce. The Court finds the answer to this question in the principles set forth in one of the Supreme Court's more recent discussions of Congress's power under the Commerce Clause—*Gonzales v. Raich*, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005).

In *Raich*, the Supreme Court held that Congress had the authority under the Commerce Clause to prohibit the purely local cultivation and use of marijuana, even when that cultivation and use was in compliance with California Law. *Raich*, 545 U.S. at 9, 125 S.Ct. 2195. Pursuant to the Controlled Substances Act, 21 U.S.C. § 801 et seq. ("CSA"), Congress had made it unlawful to manufacture, distribute, dispense, or possess any controlled substance (including marijuana) except as permitted in the CSA. *Id.* at 13, 125 S.Ct. 2195 (citing 21 U.S.C. §§ 841(a)(1), 844(a)). Despite the purely local nature of the defendants' use and cultivation of marijuana for personal medical purposes, the Supreme Court nonetheless found the CSA constitutional, as such private use and cultivation was part of an economic "class of activities" that had "a substantial effect" on interstate commerce. *Id.* at 17–18, 125 S.Ct. 2195 (citing *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *Wickard v. Filburn*, 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). Accordingly, "when a general regulatory statute bears a substantial relation to commerce, the *de minimus* character of individual instances arising under that statute is of no consequence."[17] *Id.* at 17, 125 S.Ct. 2195 (citations and quotations omitted) (emphasis in original). The Supreme Court stressed that it "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at 22, 125 S.Ct. 2195 (cita-

**15.** This section states that "[t]he term "foreign commerce", as used in this title, includes commerce with a foreign country." 18 U.S.C. § 10

**16.** The Court in *Clark* also held that § 2423(c) does not require that a defendant commit the illicit sex act while travelling in foreign commerce, and that an act committed two months after the travel was within the statute's meaning. *See Clark*, 435 F.3d at 1107–08; *see also United States v. Jackson*, 480 F.3d 1014, 1022

(9th Cir.2007). In the instant case, the period between foreign travel and the conduct in question was less than 24 hours. *See* Criminal Compl. 3–4.

**17.** The Supreme Court also noted that whether the market Congress is seeking to regulate is lawful or unlawful "is of no constitutional import." *Raich*, 545 U.S. at 19 n. 29, 125 S.Ct. 2195.

tions omitted). The Supreme Court concluded that:

> "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, 21 U.S.C. § 801(5), and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA."

*Id.* (footnote omitted.).

 As stated previously, the alleged illicit sexual conduct in the instant case is not itself commercial. However, a worldwide market exists for child prostitution, an activity that is "quintessentially economic" in nature, and that falls within foreign trade and commerce. *See Clark*, 435 F.3d at 1115.[18] As the Optional Protocol states, there is both "significant and increasing international traffic of children for the purpose of the sale of children, child prostitution and pornography," as well as "the widespread and continuing practice of sex tourism[.]" Optional Protocol (Preamble).[19]

The PROTECT Act, which contains § 2423(c), was passed to implement the Optional Protocol, and contains specific language criminalizing commercial sex with minors. *See Frank*, 486 F.Supp.2d at 1356–60. Section 105 of the PROTECT Act, where § 2423(c) and § 2423(f) are found, is entitled "Penalties Against Sex Tourism," further evincing the statute's overall economic nature. *See* H.R. Conf.

Rep. 108–66. Incidentally, a year prior to the passage of the PROTECT Act by both houses of Congress, an almost identical statute was passed only in the House of Representatives called the Sex Tourism Prohibition Improvement Act of 2002. *See* H.R.Rep. No. 107–525, 107th Cong., 2nd Sess. 2002, 2002 WL 1376220. This piece of legislation contains a statute that is substantively identical to what would later become § 2423(c) and § 2423(f). *Compare* H.R.Rep. No. 107–525 *with* H.R. Conf. Rep. 108–66 *and* 18 U.S.C. §§ 2423(c),(f). The House Report to this bill, in a section entitled "Background and Need for the Legislation" section, states:

> Many developing countries have fallen prey to the serious problem of international sex tourism.... Because poor countries are often under economic pressure to develop tourism, those governments often turn a blind eye toward this devastating problem because of the income it produces. Children around the world have become trapped and exploited by the sex tourism industry.... This legislation will close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.

H.R. Rep. 107–525 at 2–3.

Accordingly, the language of the PROTECT Act, the Optional Protocol that § 2423(c) was designed to implement, and the language accompanying § 2423(c)'s legislative forerunner all demonstrate that § 2423(c) is primarily designed to combat the human suffering and economic evils of

---

18. The Court notes here, as did the Ninth Circuit in *Clark*, that "foreign trade or commerce includes both goods and services." *Clark*, 435 F.3d at 1115 n. 18.

19. For a closer look at the billion-dollar child sex tourism industry, its component parts,

and its economic impact both at home and abroad, *see* Christine L. Hogan, Note, *Touring Commerce Clause Jurisprudence: The Constitutionality of Prosecuting Non–Commercial Sexually Illicit Acts Under 18 U.S.C. § 2423(c)*, 81 St. John's L.Rev. 641, 646 (2007).

worldwide sex tourism and child prostitution. Similar to *Raich*, there is a rational basis for concluding that leaving non-commercial sex with minors outside of federal control could affect the price for child prostitution services and other market conditions in the child prostitution industry. *See Raich*, 545 U.S. at 19, 125 S.Ct. 2195. Therefore, the Court has no difficulty concluding that Congress had a rational basis for believing that failure to regulate the non-commercial sexual abuse of minors "would leave a gaping hole" in the PROTECT Act and its ability to regulate the commercial industry of child prostitution. *See id.* at 22, 125 S.Ct. 2195.

In conclusion, given the almost complete deference federal courts have shown towards Congress in enacting laws regulating foreign commerce, the extensive powers that the Constitution affords Congress in regulating international affairs, and the unambiguous jurisdictional language in § 2423(c), this Court holds that Congress was acting well within its authority to "make all Laws which shall be necessary and proper" to "regulate Commerce with foreign Nations" when it made both the commercial and noncommercial illicit sexual conduct in § 2423(c) and § 2423(f) unlawful. At best, there has been no *"plain showing* that Congress has exceeded its constitutional bounds." *Bredimus*, 352 F.3d at 203. Accordingly, Defendant's Commerce Clause argument against § 2423(c) fails.

### E. Request for a bill of particulars

Defendant also seeks a bill of particulars regarding his Indictment. Def.'s Mot. 18–21. A bill of particulars is a "formal,

detailed statement of the claims or charges brought by ... a prosecutor." BLACK'S LAW DICTIONARY 177 (8th ed. 2004). Federal Rule of Criminal Procedure 7(f) states that "[t]he court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 10 days after arraignment or at a later time if the court permits." FED.R.CRIM.P. 7(f). Once the government provides a defendant with a bill of particulars, it is bound by the information in that bill and may not present materially different information at trial.[20] 24 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 607.07[1] (3d ed. 2008).

▮▮▮▮▮ "The purposes of a bill of particulars are to obviate surprise at trial, enable the defendant to prepare his defense with full knowledge of the charges against him, and to enable double jeopardy to be pled in case of a subsequent prosecution." *United States v. Mackey*, 551 F.2d 967, 970 (5th Cir.1977); *see also United States v. Shepard*, 462 F.3d 847, 860 (8th Cir.), *cert. denied*, 549 U.S. 1099, 127 S.Ct. 838, 166 L.Ed.2d 671 (2006). However, most requests for bills of particulars are denied. *See* MOORE'S ¶ 607.07[1]. A court must consider a defendant's need for information while mindful that the bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir.1980). Whether to grant a bill of particulars is within a trial court's sound discretion; for practical purposes, the trial court's decision is almost invariably final.[21] *See Mackey*, 551 F.2d at 970;

---

**20.** It should be noted that the government may nevertheless "amend a bill of particulars subject to such conditions as justice requires." FED.R.CRIM.P. 7(f).

**21.** To overturn a denial of a defendant's motion for bill of particulars, a defendant must demonstrate actual surprise at trial and prejudice to his substantial rights as a result. *See United States v. Marrero*, 904 F.2d 251, 254

*see also United States v. Davis,* 582 F.2d 947, 951 (5th Cir.1978) (determination of whether bill of particulars is needed is "seldom subject to precise line drawing").

Having reviewed the Indictment, Defendant has presented no compelling reason for this Court to require the Government to provide Defendant with a bill of particulars. Accordingly, Defendant's request is denied.

## IV. CONCLUSION

Defendant has prematurely argued that the counts in his Indictment are multiplicitous. Moreover, he has failed to demonstrate that an extraterritorial application of § 2423 is contrary to the intent of Congress, the plain language of the statute, or that it otherwise violates any principle of international law. In addition, Defendant has failed to make a plain showing that § 2423(c) violates the Commerce Clause of the Constitution.

Accordingly, Defendant's Motion for Dismissal in his Motions for Dismissal and For Bill of Particulars (**Doc. No. 23**) is **DENIED**.

Defendant's request for a bill of particulars contained in his Motion (**Doc. No. 23**) is **DENIED**.

Defendant's request for grand jury materials contained in his Motion (**Doc. No. 23**) is **DENIED**.

**SO ORDERED.**

(5th Cir.), *cert. denied,* 498 U.S. 1000, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990).